No. 22-50314

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**JESUS PEREZ-GARCIA,**

Defendant-Appellant.

———

Appeal from the
United States District Court
for the Southern District of California
Honorable Gonzalo P. Curiel, Presiding,
Case No. 22-cr-1581-GPC-2

———

APPELLANT'S FRAP 9(a) MEMORANDUM OF FACTS AND LAW

KATIE HURRELBRINK
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, CA 92101
(619) 234-8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Perez-Garcia

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION ....................................................... 3

STATEMENT OF THE CASE ............................................................... 3

    I.   Mr. Perez-Garcia is a licensed gun owner with no
        criminal history .............................................................. 3

    II.  While returning from Mexico, Mr. Perez-Garcia was
        arrested as a passenger in a car containing drugs. ................. 4

    III. The magistrate judge imposed a condition barring
        Mr. Perez-Garcia from having a gun .......................................... 5

    IV. Though Mr. Perez-Garcia challenged the restriction
        under the Second Amendment, the district court
        concluded that *Bruen*'s "text-and-history" test did not
        apply… ............................................................................. 6

STANDARD OF REVIEW ................................................................... 8

ARGUMENT ..................................................................................... 9

    I.   *Bruen* held that text and history provide the "only" route
        to validating a gun regulation. ................................................ 9

    II.  Mr. Perez-Garcia—a presumptively innocent, licensed
        gun owner—falls within the Second Amendment's plain
        text. ............................................................................... 13

    III. There is no historical tradition of barring gun possession
        solely because of pretrial release, and Mr. Perez-Garcia
        does not fall within any other historical tradition. ................. 16

        A.   Criminal accusations do not *per se* justify
            requiring gun owners to surrender their arms. .......... 17

i

B.    The court did not identify any other historical tradition validating complete disarmament in Mr. Perez-Garcia's particular case. .............................. 20

    i.    The district court did not show that Standard Condition #4 is distinctly similar, or even analogous, to surety statutes. ................ 23

    ii.    The court's factual findings do not show that surety statutes would apply to Mr. Perez-Garcia. ............................................... 25

    iii.    The court could not circumvent the "text-and-history" test by adding to *Heller*'s list of "presumptively lawful" regulations. ................... 30

CONCLUSION ............................................................ 32

ii

## TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Coffin v. United States,*
   156 U.S. 432 (1895)..................................................................... 16

*District of Columbia v. Heller,*
   554 U.S. 570 (2008)............................................................... *passim*

*Grover v. Bullock,*
   No. 185 (Worcester Cty., Aug. 13, 1853) ............................................ 26

*King v. Cnty. of Los Angeles,*
   885 F.3d 548, 555 (9th Cir. 2018)..................................................... 29

*Matter of Requested Extradition of Kirby,*
   106 F.3d 855 (9th Cir. 1996).......................................................... 3

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
   142 S. Ct. 2111 (2022)............................................................. *passim*

*Stack v. Boyle,*
   342 U.S. 1 (1951)..................................................................... 18

*United States v. Chovan,*
   735 F.3d 1127 (9th Cir. 2013)..................................................... *passim*

*United States v. Fidler,*
   419 F.3d 1026 (9th Cir. 2005)......................................................... 8

*United States v. Holden,*
   No. 22-CR-30 RLM-MGG, 2022 WL 17103509 (N.D. Ind.
   Oct. 31, 2022) ....................................................................... 19

*United States v. Jimenez-Shilon,*
  34 F.4th 1042 (11th Cir. 2022) ............................................................. 14

*United States v. Meza-Rodriguez,*
  798 F.3d 664 (7th Cir. 2015) ................................................................. 14

*United States v. Quiroz,*
  No. 22-CR-00104-DC, 2022 WL 4352482 (W.D. Tex.
  Sept. 19, 2022) ........................................................................................ 19

*United States v. Scott,*
  450 F.3d 863 (9th Cir. 2006) ................................................... 14, 16, 21

*United States v. Skoien,*
  614 F.3d 638 (7th Cir. 2010) ................................................................. 15

*United States v. Stambaugh,*
  No. CR-22-00218-PRW-2, 2022 WL 16936043 (W.D. Okla.
  Nov. 14, 2022) ....................................................................... 19, 22, 26

*United States v. Townsend,*
  897 F.2d 989, 994 (9th Cir. 1990) .......................................................... 8

*United States v. Wolf Child,*
  699 F.3d 1082 (9th Cir. 2012) ............................................................... 21

## Statutes                                                        Page(s)

18 U.S.C. § 922(n) .................................................................................... 19

18 U.S.C. § 3142 ................................................................................... 1, 29

18 U.S.C. § 3145 ........................................................................................ 3

21 U.S.C. § 952 .......................................................................................... 4

21 U.S.C. § 960 ..................................................................................4

28 U.S.C. § 1291 ................................................................................3

Bail Reform Act of 1984,
   Pub. L. 98-473, § 203, 98 Stat. 1976, 1977............................19

Judiciary Act of 1789,
   ch. 20, 1 Stat. 73, 91 (1789) ....................................................18

Mass. Rev. Stat., ch. 134, § 16 (1836) ...................................22

Fed. R. App. P. 4 ...............................................................................3

Fed. R. App. P. 9...............................................................................3

**Constitutional Provisions**                                    **Page(s)**

U.S. Const. amend. VIII ...............................................................18

English Bill of Rights, 1689, 1 W.&M., c. 2 (Eng.) .................18

**Other Authorities**                                            **Page(s)**

S. Rep. 98-225 (1984)....................................................................31

Amaryllis Austin, THE PRESUMPTION FOR DETENTION STATUTE'S
   RELATIONSHIP TO RELEASE RATES, U.S. Courts (Sept. 2017),
   https://tinyurl.com/2p9cfytv .................................................32

William Rawle, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF
   AMERICA (2d ed. 1829) ...........................................................28

v

# INTRODUCTION

This Second Amendment appeal centers on a standard pretrial release condition in the Southern District of California: that releasees not "possess a firearm" and "legally transfer all firearms" already owned. Ex.H. This "Standard Condition #4," preprinted on every release order, "applies, unless stricken." *Id*. The condition does not affect felons, the mentally ill, and others statutorily prohibited from possessing guns, as release is always conditioned on following the law. *See* 18 U.S.C. § 3142(c)(1)(A). But in this district, where most defendants have little or no criminal history, Ex.C-30, many may otherwise lawfully bear arms.

Yet Southern District judges virtually never strike the condition, even for nonviolent charges like stealing mail or smuggling counterfeit jeans. Ex.C-29–30. A review of over 150 release orders identified just one, a Social Security fraud misdemeanor, without the condition. *Id*. Five other Social Security misdemeanor orders included the condition. *Id*. So did every other release order issued from mid-September to mid-October 2022. *Id*. No other constitutional right is so reflexively and entirely abridged.

1

Mr. Perez-Garcia is one of the pretrial releasees subject to this condition. A U.S. citizen and licensed gun owner with no criminal history, Mr. Perez-Garcia used his firearm to work as a security guard and to defend his home. Ex.B-27. He was arrested as a passenger in a car containing drugs. He denied knowing about the drugs, and the driver took sole responsibility. Ex.C-78–79. Yet the court concluded that Standard Condition #4 could constitutionally be applied to him because the government had accused him of a "serious" drug crime. Ex.A-10–11.

Our constitutional tradition demands greater respect for the fundamental right protected by the Second Amendment, especially for those presumed innocent. In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court confirmed that the government can justify a gun restriction "only" by reference to constitutional text and history. 142 S. Ct. 2111, 2126–30 (2022). Because the government has not shown that applying this condition to Mr. Perez-Garcia is consistent with the Amendment's text and our historical traditions, this Court must reverse.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over "all final decisions of the district courts of the United States," 28 U.S.C. § 1291, including "[b]ail decisions in criminal cases." *Matter of Requested Extradition of Kirby*, 106 F.3d 855, 860 (9th Cir. 1996); *see also* 18 U.S.C. § 3145(c); Fed. R. App. P. 9(a). Mr. Perez-Garcia timely appealed 14 days after the district court's bail decision. Ex.A, Ex.I; *see* Fed. R. App. P. 4(b)(1)(A)(i).

## STATEMENT OF THE CASE

### I. Mr. Perez-Garcia is a licensed gun owner with no criminal history.

Mr. Perez-Garcia is a U.S. citizen who is licensed to carry a gun in California. Ex.B-27; Ex.C-17. Before this case, he worked as a security guard and was required to carry a firearm for work. Ex.A-2.

Mr. Perez-Garcia lives with his parents and younger sister near a high crime area. Ex.A-3. He helps care for his sister, who is blind. Ex.C-24. He has always felt responsible to protect his family if someone were to break into their home, particularly because his father works nights as a janitor. Ex.D-3.

**II.** **While returning from Mexico, Mr. Perez-Garcia was arrested as a passenger in a car containing drugs.**

In June 2022, Mr. Perez-Garcia and his friend Antonio were returning to the U.S. from a fishing trip in Mexico. Ex.C-78. Antonio was driving, and Mr. Perez-Garcia was a passenger. Ex.C-77. During a customs inspection at the port of entry, officers found drugs hidden in the car's bumper. *Id.*

Post-arrest, Antonio admitted to intentionally smuggling drugs, but stated that Mr. Perez-Garcia "did not know there were drugs inside the vehicle when they crossed into the United States." Ex.C-79. Mr. Perez-Garcia likewise stated that he had "no idea" there would be "drugs inside the vehicle when they crossed the border." Ex.C-78. Though Antonio had told Mr. Perez-Garcia at one point that he was "going to get drugs," Mr. Perez-Garcia thought Antonio meant a "user amount for them to use" in Mexico. *Id.* Nevertheless, officials charged both Antonio and Mr. Perez-Garcia with knowingly importing a controlled substance. 21 U.S.C. §§ 952, 960.

4

## III. The magistrate judge imposed a condition barring Mr. Perez-Garcia from having a gun.

Several days later, Mr. Perez-Garcia appeared in magistrate court. Ex.B. At that hearing, the government did *not* argue that he was dangerous or should be detained. Ex.C-23. Instead, the prosecutor recommended that the judge set a $10,000 bond in light of Mr. Perez-Garcia's "lesser involvement." *Id.*

The judge adopted this recommendation without further findings. Ex.C-25. She then added, "Oh, I will note that you have to transfer ownership of any firearms. That's already in the – the order." *Id.* The release order memorialized this in Standard Condition #4, which stated that Mr. Perez-Garcia "must not possess" and must "legally transfer all firearms." Ex.H.

Because of this condition, Mr. Perez-Garcia could not apply for other armed security jobs. His new job at a food truck paid about half as much. Ex.F-2. He also felt vulnerable with no way to protect his home and family. Ex.B-25.

5

**IV.  Though Mr. Perez-Garcia challenged the restriction under the Second Amendment, the district court concluded that *Bruen*'s "text-and-history" test did not apply.**

A month after release, Mr. Perez-Garcia moved to lift Standard Condition #4 on Second Amendment grounds. Ex.G. He pointed out that under the Supreme Court's recent decision in *Bruen*, only constitutional text and history—not a weighing of government interests—can validate gun restrictions. 142 S.Ct. at 2126. Initially, courts must decide whether the "Second Amendment's plain text covers an individual's conduct." *Id*. at 2129–30. If so, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id*. (simplified).

The magistrate judge denied the motion, and Mr. Perez-Garcia sought de novo review in district court. Ex.A-2–3. The district court, too, rejected his challenge. *Id*.

The court began by asserting that *Bruen* "does not suggest that its [text-and-history] inquiry automatically applies to any regulation

6

involving or affecting firearms." Ex.A-6. Instead, the court examined

three "threshold issues before proceeding to *Bruen*'s Second

Amendment test." *Id.*

First, the court opined that *Bruen* might "reasonabl[y]" be

understood to limit Second Amendment protections only to "law-

abiding" persons. *Id.* But because Mr. Perez-Garcia is presumed

innocent, the court concluded that he retains Second Amendment

rights. Ex.A-7.

Second, the court claimed that this Court's pre-*Bruen* precedent

allowed the government to validate gun restrictions by showing that

they are "longstanding," and thus, "presumptively lawful." Ex.A-8

(citing *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013)).

Standard Condition #4 fell in that category, because it "clearly

resemble[d]" nineteenth century surety statutes requiring those who

might "breach the peace" to post bond before bearing arms in public. *Id.*

Third, the court determined that Mr. Perez-Garcia "pose[d] a

danger, i.e.," might "breach the peace." Ex.A-9, 11. The court reasoned

that the Bail Reform Act of 1984 ("BRA") rebuttably presumes that

7

accused drug importers should be detained, and it quoted a 1984 Senate Report opining that importers often recidivate. Ex.A-10–11. The court also stated (incorrectly) that both Mr. Perez-Garcia and Antonio "admitted that they knew they were importing narcotics." *Id*. Thus, per the court, "the nature of the charges and weight of the evidence supports a conclusion that Defendant is a danger to others and that Condition #4 is appropriate." Ex.A-11.

This appeal follows.

## STANDARD OF REVIEW

In assessing a BRA order, this Court reviews underlying factual findings for clear error but "the conclusions based on such factual findings" de novo. *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990). In particular, this Court "make[s] an independent examination of the record to determine whether [a BRA order] is consistent with the defendant's constitutional and statutory rights." *Id*.; *see also United States v. Fidler*, 419 F.3d 1026, 1029 (9th Cir. 2005) (applying equivalent standards of review to a "pretrial release or detention order").

8

ARGUMENT

## I. *Bruen* held that text and history provide the "only" route to validating a gun regulation.

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that this Amendment confers an individual right to gun ownership. 554 U.S. 570, 595 (2008). It then assessed the handgun ban challenged in that case, employing a "methodology centered on constitutional text and history." *Bruen*, 142 S.Ct. at 2118. Because the Amendment's plain text covered the right of all members of our "national community" to "keep and bear" arms, and its history revealed no tradition comparable to D.C.'s ban, the regulation was unconstitutional. *Heller*, 554 U.S. at 579–626.

For the next decade, however, Second Amendment litigation produced few additional constraints on government power. *Bruen*, 142 S.Ct. at 2130–31. This was largely because lower courts added to *Heller*'s "text-and-history" test. Courts first asked whether a regulation accorded with text and history. *Id.* at 2126. But even if not, courts gave the government a *second* chance to validate the regulation by satisfying

9

strict or intermediate scrutiny. *Id.* Few regulations failed this "two-step" inquiry, as the second step usually ended with "judicial deference to legislative interest balancing." *Id.* at 2131.

Last year, in *Bruen*, the Supreme Court reinstated the *Heller* test. The Court held that the lower courts' interest-balancing additions were "inconsistent with *Heller*'s historical approach." *Id.* at 2129–30. It "reiterate[d]" that constitutional text and history are the "only" avenues for justifying a gun restriction. *Id.* at 2126, 2129–30.

*Bruen* then detailed exactly what the government must show to justify firearms restrictions. Initially, a court must determine whether the individual's conduct falls within "the Second Amendment's plain text." *Id.* at 2126. If so, the conduct is "presumptively" constitutional. *Id.*

To restrict such conduct, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation" when the Second Amendment was ratified. *Id.* at 2130. This historical inquiry varies depending on the regulation. "[W]hen a challenged regulation addresses a general societal problem

10

that has persisted since the 18th century," courts must ask whether "a distinctly similar historical regulation address[ed] the problem." *Id.* at 2131. If earlier generations did not regulate the problem, or if they regulated it "through materially different means," then the challenged regulation violates the Second Amendment. *Id.*

When a regulation implicates "unprecedented societal concerns," "dramatic technological changes," or regulations "unimaginable at the founding," however, the "historical inquiry will often involve reasoning by analogy." *Id.* at 2132. In analogizing, courts must ask whether the historical and modern regulations are "relevantly similar," with special attention to "how and why the regulations burden" Second Amendment rights. *Id.* at 2132–33. In either case, the government must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

*Bruen* thus could not have been clearer: Constitutional text and a particular mode of historical analysis provide the "only" relevant metrics for assessing a gun law. *Id.* at 2126, 2130. Yet, here, the court

11

refused to "proceed[] to *Bruen*'s Second Amendment test." Ex.A-6. Instead, the court employed a series of "threshold" inquiries to deny the challenge. *Id*. Without consulting constitutional text, the court opined that *Bruen* might limit Second Amendment rights to the "law-abiding"—though the court placed Mr. Perez-Garcia in that category. *Id*. at 6–7. Then, instead of following *Bruen*'s detailed instructions for conducting historical comparisons, the court derived a different historical test from this Court's *Chovan* decision. *Id*. at 8–9. Using that method, the court concluded that Standard Condition #4 is "presumptively lawful" because it "clearly resembl[ed]" nineteenth-century surety statutes. *Id*. Finally, the court determined that Mr. Perez-Garcia (and, by extension, persons accused of similar drug crimes) fell within that presumptively lawful regulation because of the 1984 Congress's view of the seriousness of his alleged offense. *Id*. at 10–11.

In short, the court set aside *Bruen*'s detailed instructions, cleared additional paths for the government to bar gun possession, and deferred to the legislative interest balancing underlying the challenged

restriction. This is eerily similar to how courts previously deprived *Heller* of much of its force. *Bruen*, 142 S.Ct. at 2131. This Court must not retread that path. The Southern District of California may not relegate Second Amendment rights to "second-class" status. *Id.* at 2156. District courts must apply *Bruen*'s framework. And using that framework, this Court must reverse.

## II. Mr. Perez-Garcia—a presumptively innocent, licensed gun owner—falls within the Second Amendment's plain text.

The *Bruen* analysis begins by asking whether, as a matter of plain text, the defendant's challenge implicates "the right of the people to keep and bear arms." U.S. Const. amend. II. Mr. Perez-Garcia's proposed conduct is the same as in *Heller* and *Bruen*: "keep[ing]" guns at home and "bear[ing]" them in public. *Bruen*, 142 S.Ct. at 2134–35.

Mr. Perez-Garcia is also "part of 'the people' whom the Second Amendment protects." *Id.* at 2134 (quoting *Heller*, 554 U.S. at 580). *Heller* teaches that "the people" is "a term of art" employed in seven constitutional provisions, including the First, Second, and Fourth Amendments. 554 U.S. at 580 (simplified). Each usage "unambiguously refers to all members of the political community, not an unspecified

13

subset." *Id.* In the Bill of Rights specifically, "the people" "refers to a class of persons who are part of a national community." *Id.* (simplified). This creates a "strong presumption that the Second Amendment right" is also "exercised individually and belongs to all Americans," not just to militiamen. *Id.* at 581. That strong presumption—subsequently confirmed through full textual and historical vetting—was integral to *Heller*'s holding that the Second Amendment protects an individual right. *Id.* at 579–95.

Pretrial releasees fall squarely within *Heller*'s "'national community'-focused definition" of "the people." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044 (11th Cir. 2022). Just as releasees share the "right[s] of the people" guaranteed under the First and Fourth Amendments, *see, e.g.*, *United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006), so too must they be part of "the people" for Second Amendment purposes. *United States v. Meza-Rodriguez*, 798 F.3d 664, 669–72 (7th Cir. 2015). The government cannot exclude someone from that community through mere accusation. *Cf. Chovan*, 735 F.3d at 1136

14

("hold[ing]" that even convicted domestic violence misdemeanants "fall within the [Second Amendment's] scope").

Here, however, the court did not perform the textual analysis modeled in *Heller*. Ex.A-6. Instead, because the *Bruen* majority "use[d] the phrase 'law-abiding' nearly a dozen times," the court suggested that the Second Amendment might be limited to the "law-abiding." *Id.*

That suggestion rests on a misreading of *Bruen*. The plaintiffs in *Bruen* were law-abiding citizens. 142 S.Ct. at 2134. *Bruen* therefore considered only whether such persons had a right to public carry; it did not decide how the Amendment would apply to others. *Id.* at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm."). Accordingly, the law-abiding language is "precautionary." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010). "Instead of resolving questions" about how the government may regulate the non-law-abiding, it "t[ells] us that the matters have been left open." *Id.* And under *Bruen*, the "only" way to resolve open questions about the Amendment's scope is through textual analysis. 142 S.Ct. at 2126, 2131.

15

In any case, as the court acknowledged, the presumption of innocence prevents courts from inferring that the accused are not "law-abiding." Ex.A-7. "[A]xiomatic and elementary" in our criminal system, the presumption of innocence has been practiced "in the common law from the earliest time." *Coffin v. United States*, 156 U.S. 432, 453 (1895). And "innocence can only raise an inference of innocence, not of guilt." *Scott*, 450 F.3d at 874. The court therefore correctly concluded that Mr. Perez-Garcia falls in the Amendment's scope. *Id.*

## III. There is no historical tradition of barring gun possession solely because of pretrial release, and Mr. Perez-Garcia does not fall within any other historical tradition.

Though Mr. Perez-Garcia presumptively retains Second Amendment rights, the Southern District of California presumes the opposite. Every release order comes with a preprinted bar on gun possession, which is invariably imposed. Ex.C-28–30; Ex.H.

The government cannot meet its burden to justify this restriction. Our nation has no historical tradition of disarming persons just because they are on pretrial release. To be sure, a *particular* release condition in a *specific* case may fall within some other regulatory tradition. But the

court's findings did not show that any such tradition encompassed Mr. Perez-Garcia. Accordingly, as applied to him, the condition violates the Second Amendment.

### A. Criminal accusations do not *per se* justify requiring gun owners to surrender their arms.

As noted, *Bruen* instructs courts to tailor the historical analysis depending on the problem that the challenged regulation addresses. 142 S.Ct. at 2131–34. Standard Condition #4 addresses a problem as old as bail itself: that pretrial releasees may endanger others with guns. Because "the Founders themselves" faced the same issue, and "could have adopted" the solution of disarming releasees, this Court's historical inquiry is "straightforward." *Id.* at 2131. If the government cannot identify a "distinctly similar historical regulation addressing that problem," or if historical regulations addressed the problem "through materially different means," the challenged regulation violates the Second Amendment. *Id.*

Here, the government has produced no pre-twentieth-century examples of courts or legislatures restricting pretrial releasees' arms rights. Ex.E-11. Nor has the government identified any other regulation

17

aimed at the "problem" of releasees' access to guns. Thus, it has not proved a distinctly similar tradition of regulation based on the bare fact of pretrial release.

These evidentiary gaps are no surprise. Founding-era courts and legislatures regulated the accused's behavior with the dual levers of detention and bail—not with conditions depriving them of arms.

The institution of bail long predates the founding. The Constitution's prohibition on excessive bail is copied from the 1689 English Bill of Rights. *Compare* U.S. Const. amend. VIII, *with* English Bill of Rights, 1689, 1 W.&M., c. 2 (Eng.). The Judiciary Act of 1789, adopted by the first Congress, governed federal bail for the next 176 years. Judiciary Act of 1789, ch. 20, 1 Stat. 73, 91 (1789). That law "provided that a person arrested for a non-capital offense shall be admitted to bail." *Stack v. Boyle*, 342 U.S. 1, 4 (1951). Bail amounts could not be excessive but were otherwise discretionary. *Id*. The government has presented no evidence that conditions of bail ever involved restricting firearms possession. Thus, the Founding generation's "means" of regulating potentially dangerous pretrial

18

releasees was "materially different" from the Southern District's wholesale disarmament. *Bruen*, 142 S.Ct. at 2131.

Congress first permitted gun restrictions as a pretrial release condition in 1984, too late to shed light on the Second Amendment's meaning. *See* Pub. L. 98-473, § 203, 98 Stat. 1976, 1977 (codified as amended at 18 U.S.C. § 3142(c)(1)(B)(viii)); *Bruen*, 142 S.Ct. at 2154 n.28. But to this day, federal law does not invariably require pretrial releasees to surrender their guns. Rather, they are prohibited only from buying new firearms or selling their old ones. 18 U.S.C. § 922(n). And even that limitation is so historically unprecedented that, post-*Bruen*, at least three courts have deemed it unconstitutional. *See United States v. Quiroz*, No. 22-CR-00104-DC, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022); *United States v. Holden*, No. 22-CR-30 RLM-MGG, 2022 WL 17103509 (N.D. Ind. Oct. 31, 2022); *United States v. Stambaugh*, No. CR-22-00218-PRW-2, 2022 WL 16936043 (W.D. Okla. Nov. 14, 2022).

Thus, no historical tradition condones complete disarmament just because a person is on pretrial release. The Southern District's practice of doing just that violates the Second Amendment.

19

**B.    The court did not identify any other historical tradition validating complete disarmament in Mr. Perez-Garcia's particular case.**

Though pretrial release itself does not justify complete disarmament, that does not end the inquiry. The government might still be able to show, in a specific case, that a particular release condition falls within some other regulatory tradition. For instance, *Bruen* recognized a tradition of banning guns in "sensitive places," like courthouses and legislatures. 142 S.Ct. at 2133. It follows that release conditions could bar defendants from bringing guns to similar "sensitive places," like the Pretrial Services office. Likewise, if the government can demonstrate that the releasee engaged in behavior that would historically lead to disarmament, that would validate a disarmament condition, too.

A court can justify imposing a firearms condition by making special findings locating both the condition and the person in a relevant historical tradition. That would resonate with how this Court treats other rights. Supervised release conditions that infringe on a "particularly significant liberty interest" call for "enhanced

20

procedur[es]," including "mak[ing] special findings on the record
supported by evidence." *United States v. Wolf Child*, 699 F.3d 1082,
1087 (9th Cir. 2012). If no such evidence is produced, the Court will
strike the condition as "substantively unreasonable." *Id.* at 1103.
Pretrial releasees have even greater claims to liberty, as they have
"suffered no judicial abridgement of their constitutional rights." *Scott*,
450 F.3d at 872. Thus, the procedural hurdles to imposing liberty-
restricting conditions must be at least as great. *See id.* at 865, 874
(giving little credence to Fourth Amendment waiver condition because
it did not result from "findings" but was merely "checked off by a judge
from a standard list of pretrial release conditions").

Here, the district court tried to justify disarming Mr. Perez-Garcia
by citing historical surety statutes. Surety statutes "required certain
individuals to post bond before carrying weapons in public" if an accuser
"could make out a specific showing of 'reasonable cause to fear an
injury, or breach of the peace.'" *Bruen*, 142 S.Ct. at 2147 (quoting Mass.
Rev. Stat., ch. 134, § 16 (1836)). The court reasoned that both surety
statutes and the BRA mandate "individualized finding[s]"—specifically,

21

findings that a pretrial releasee "poses a danger, i.e., [they] [are] 'reasonably likely to breach the peace.'" Ex.A-9. Thus, the court concluded that persons who pose a "danger to the community" under the BRA can be disarmed. Ex.A-11. The court placed Mr. Perez-Garcia in that category because of his drug charges. *Id.*

This comparison fails. As an initial matter, there is reason to doubt that surety statutes provide any "insight into the meaning of the Second Amendment." *Bruen*, 142 S.Ct. at 2154. They arose not during the founding era, but between 1838 and 1871. *Id.* at 2120. By 1871, "a full eighty years after" the Second Amendment's ratification, "only ten of the Nation's thirty-seven states had adopted" them. *Stambaugh*, 2022 WL 16936043, at *4. And even in these jurisdictions, there is "little evidence that authorities ever enforced surety laws." *Bruen*, 142 S. Ct. at 2149.

But this Court need not resolve all questions about the interplay between surety statutes and the Second Amendment. At a minimum, surety statutes do not justify applying a complete ban on gun possession to someone like Mr. Perez-Garcia.

### i. The district court did not show that Standard Condition #4 is distinctly similar, or even analogous, to surety statutes.

The surety statute comparison fails, first and foremost, because Standard Condition #4 imposes a far greater burden on Second Amendment liberties.

In *Bruen*, too, New York tried to rely on surety statutes to validate its "proper-cause" requirement, which conditioned public carry licenses on demonstrating a special self-defense need. 142 S.Ct. at 2148. *Bruen* rejected the comparison, largely because surety statutes "were not *bans* on public carry.*" Bruen*, 142 S.Ct. at 2148. Rather, they allowed the accused to "go on carrying without criminal penalty so long as he posted money that would be forfeited if he breached the peace or injured others—a requirement from which he was exempt if *he* needed self-defense." *Id.* (simplified). Accordingly, there is "little reason to think" such laws "would have prevented anyone from carrying a firearm for self-defense." *Id.* at 2149.

Thus, *Bruen* shows that surety statutes are not "distinctly similar" to complete bans on gun possession. *Id.* at 2131. Standard Condition #4

23

is a complete ban—and not just on public carry. Ex.H. It extends "to the home, where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628. Surety statutes never encroached on that space.

The court acknowledged this glaring difference, but waved it away with the conclusory observation that "analogical reasoning under the Second Amendment is [not] a regulatory straightjacket." Ex.A-9 (quoting *Bruen*, 142 S.Ct. at 2133). Were this all it took to overcome the Second Amendment, legislatures would—contrary to *Bruen*—have a "regulatory blank check." 142 S.Ct. at 2133.

Fortunately, *Bruen* provides express instructions on how to navigate the space between these poles. Not only does *Bruen* bar analogies to founding-era problems, it also limits their reach to ensure that courts do not "engage in independent means-end scrutiny under the guise of an analogical inquiry." *Id*. at 2131–34, 2133 n.7. Those limits require courts to compare "how" and "why" the regulations burden gun rights. *Id*. at 2133. Here, the "how" is not even close. Surety statutes required payment of a fee before carrying guns publicly for

non-self-defense purposes. *Id*. at 2148. Standard Condition #4 is a complete ban with no exceptions. Ex.H. And the "why" is equally mismatched, as explained next.

> ### ii. The court's factual findings do not show that surety statutes would apply to Mr. Perez-Garcia.

There is a second, independent reason why the surety statute comparison fails: The court's findings do not show that Mr. Perez-Garcia falls within the ambit of this purported historical tradition.

This was *Bruen*'s other key rationale for rejecting New York's attempts to rely on surety statutes. Surety statutes "typically targeted only those threatening to do harm." *Bruen*, 142 S.Ct. at 2148. Specifically, "an individual's carrying of arms was 'sufficient cause to require him to give surety of the peace' *only* when 'attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them.'" *Id*. (emphasis added) (quoting William Rawle, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 126 (2d ed. 1829)). In other words, the accuser had to make "a showing of reasonable cause to fear that a person would cause an injury or breach of the peace *with a firearm*." *Stambaugh*, 2022 WL 16936043, at \*5.

25

Contrary to New York's view, this was no "*pro forma*" prerequisite. *Bruen*, 142 S.Ct. at 2149. In fact, the only known historical case "involved a justice of the peace declining to require a surety, even when the complainant alleged that the arms-bearer 'did threaten to beat, wou[n]d, mai[m], and kill' him." *Id.* (punctuation altered) (quoting *Grover v. Bullock*, No. 185 (Worcester Cty., Aug. 13, 1853)). Thus, the "reasonable cause" requirement was not a rubber stamp, but a robust guardrail.

Here, Mr. Perez-Garcia has no prior convictions or even arrests, violent or otherwise. He is not accused of using or even carrying a gun during the alleged offense. He has made no threats and caused no gun-related harm. Still, the court made two findings about Mr. Perez-Garcia's case to justify complete disarmament: first, that he was charged with a drug offense punishable by at least ten years, and second, that post-arrest statements confirmed his guilt. Ex.A-12. (As explained above, the latter is false. Ex.C-78–79.)

These factual findings do not bring Mr. Perez-Garcia within the ambit of the purported "surety statute" tradition. As an initial matter,

26

the court made no "*specific* showing" that Mr. Perez-Garcia would likely do harm. *Bruen*, 142 S.Ct. at 2148. Findings based on the statute of indictment are general and generic—closer to the *pro forma* approach advanced by New York than the searching review embodied in *Grover*.

Additionally, the district court martialed no evidence about what the "breach of the peace" criterion historically meant. The court simply equated it, without citation, to "pos[ing] a danger." Ex.A-9. But at a minimum, *Bruen* instructs that surety statutes targeted a particular *kind* of danger: danger of misusing a firearm. 142 S.Ct. at 2148. The court did not explain why drug importation charges *per se* demonstrate that kind of risk.

To put the problem in *Bruen*'s terms, the authority to regulate a narrow, targeted group of firearms misusers is not "distinctly similar" to the broad disarmament power exercised in the Southern District, 142 S.Ct at 2131. And as noted above, analogical reasoning is equally unavailing, because the "why" behind surety statutes does not justify applying them here. Surety statutes had nothing to do with whether a person was charged with a crime. Instead, they were meant to

27

disincentivize specific, reasonably foreseeable acts of public, gun-related misconduct. *Id.* at 2148–49. The district court's findings do not show that this intention translates to completely disarming accused drug importers. Ex.A-12.

Worst of all, in place of individualized findings or historical grounding, the court substituted deference to legislative interest balancing. The court concluded that Mr. Perez-Garcia's charge warranted disarmament, not because of regulatory traditions around 1791, but because of Congress's concerns in the Bail Reform Act of 1984. The court noted that the BRA raises a presumption of detention for drug offenses punishable by at least 10 years, including importation. Ex.A-10. And the court quoted a Senate report claiming that drug traffickers pose a special risk of pretrial recidivism. *Id.* (quoting S. Rep. 98-225 (1984)).

There are many problems with this reasoning. To name a few: The BRA's "presumption" involves detention, not conditions. 18 U.S.C. § 3142(e)(2). The government could not prove—even with the aid of a presumption—that detention was warranted here. Ex.C-23. Relying on

28

the presumption would justify disarming almost all persons charged with a federal drug offense (93%, according to one probation report), but far fewer persons accused of violence. Amaryllis Austin, THE PRESUMPTION FOR DETENTION STATUTE'S RELATIONSHIP TO RELEASE RATES 55, U.S. Courts (Sept. 2017), https://tinyurl.com/2p9cfytv; *King v. Cnty. of Los Angeles*, 885 F.3d 548, 555 (9th Cir. 2018) (judicially noticing government website). And government statistics show that "the presumption does a poor job of assessing risk," particularly of violence. Austin, *supra*, at 58–59; *see also Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 783 n.6 (9th Cir. 2014) (law imposing presumption of detention showed a "perceived" problem, but "not that one actually existed").

But there is a larger issue from a constitutional perspective. By letting modern-day legislatures dictate who should be disarmed, the court undermined the very point of *Bruen*: that historical tradition, not legislative interest-balancing, defines the Second Amendment's scope. 142 S.Ct. at 2131.

29

In short, the court failed to make the proper findings to show that Mr. Perez-Garcia fell into the tradition it identified. This is a second, independent reason to reverse.

### iii. The court could not circumvent the "text-and-history" test by adding to *Heller*'s list of "presumptively lawful" regulations.

It is no surprise that the court's analysis was so inconsistent with *Bruen*, because the court believed that it did not have to "proceed to *Bruen*'s Second Amendment test" at all. Ex.A-6. Instead, citing this Court's pre-*Bruen* decision in *Chovan*, the court claimed that pretrial release conditions restricting firearms were permissible because they are sufficiently "longstanding" to be "presumptively lawful." Ex.A-7. The court determined that *Chovan* validated Standard Condition #4— not because the condition was distinctly similar or even analogous to a historical regulation—but because it "resemble[d]" surety statutes. Ex.A-8. And the Court glossed over *Bruen*'s distinction between surety statutes and complete bans, because "nothing in *Chovan* suggest[ed] that this difference" was dispositive. Ex.A-9.

30

In fact, this analysis contradicts *Chovan* itself. The district court took the "presumptively lawful" language from a passage in *Heller*, which clarified that *Heller* did not "cast doubt" on a list of "longstanding" regulations like felon-in-possession bans. 445 U.S. at 626 & n.26. In *Chovan*, the government urged this Court to add restrictions on domestic violence misdemeanants to *Heller*'s list, because like felons, these individuals were "perceived as dangerous or violent." 735 F.3d at 1137. This Court rejected that argument because (1) restrictions on domestic violence misdemeanants were not on *Heller*'s list, and (2) "the government ha[d] not proved that *domestic violence misdemeanants* in particular ha[d] . . . been restricted from bearing arms" until 1966. *Id.* at 1137 (emphasis original).

Both observations are equally true of Standard Condition #4. Pretrial release conditions are not on *Heller*'s list. And no statute permitted courts to restrict arms bearing by pretrial releasees "in particular" until the twentieth century. *Id. Chovan* therefore does not help the government.

31

More importantly, though, *Bruen* eliminated any argument that the government can validate a gun restriction by analogizing to *Heller*'s "presumptively lawful" regulations. Rather, "[o]nly" by following *Bruen*'s detailed instructions for historical comparison "may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Bruen*, 142 S.Ct. at 2130 (simplified). By creating another pathway for the government to justify a complete arms ban, the court defied *Bruen*'s clear instruction that text and history is the *only* test. *Id.*

## CONCLUSION

In sum, the district court did not identify a deeply rooted historical tradition to validate either Standard Condition #4 or its application to Mr. Perez-Garcia. Worse yet, the court denied that *Bruen*'s detailed procedures govern all gun regulations, instead filtering its historical analysis through a series of court-created "threshold" inquiries. When *Bruen*'s test is appropriately applied, Standard

32

Condition #4 must be stricken under the Second Amendment. This Court must therefore reverse.

Respectfully submitted,

DATED: January 3, 2023          *s/Katie M. Hurrelbrink*

Katie M. Hurrelbrink
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
619.234.8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Perez-Garcia

# CERTIFICATE OF RELATED CASES

The same constitutional challenge at issue in this appeal will be presented in *United States v. Fencl*, No. 22-50316.

Respectfully submitted,

DATED: January 3, 2023          *s/Katie M. Hurrelbrink*
Katie M. Hurrelbrink
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
619.234.8467
Katie_Hurrelbrink@fd.org

Attorneys for Mr. Perez-Garcia

## CERTIFICATE OF COMPLIANCE

I certify that this memorandum:

(1) complies with the length limits permitted by Ninth Circuit Rule 9-1, Ninth Circuit Rule 27-1(1)(d), and Ninth Circuit Rule 32-3(2) because it contains 5,599 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f); and

(2) complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in Century Schoolbook 14-point font.

Respectfully submitted,

DATED: January 3, 2023      *s/Katie M. Hurrelbrink*

Katie M. Hurrelbrink
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
619.234.8467
Katie_Hurrelbrink@fd.org