**Nos. 22-50314, 22-50316**

_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**JESUS PEREZ-GARCIA** and **JOHN FENCL,**

Defendants-Appellants.

———

Appeal from the
United States District Court
for the Southern District of California
Case Nos. 22-CR-1581-GPC-2, 21-CR-3101-JLS

———

**APPELLANT'S PETITION FOR VACATUR, REHEARING, OR
REHEARING EN BANC**

_____

KATIE HURRELBRINK
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, CA 92101
(619) 234-8467
Katie_Hurrelbrink@fd.org

Attorneys for Appellants

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................ii

INTRODUCTION............................................................................ 1

ARGUMENT................................................................................ 3

    I.    The panel's overreach warrants equitable vacatur. ................. 3

        A.    As a second, independent, and unnecessary
            ground for the decision, the panel weighed in on
            the central question in a host of *Bruen* appeals............ 4

        B.    Nearly all the panel's supporting historical
            sources appear in government filings in *Rahimi*;
            few appear in this case's briefs. ..................................... 5

        C.    No countervailing equitable considerations
            warrant a different conclusion....................................... 7

    II.    The panel issued an advisory opinion in a long-moot case........ 8

        A.    *EPIC* squarely holds that the panel had no
            Article III authority to issue this opinion...................... 9

        B.    The panel's procedure creates a blueprint for
            issuing expansive, en-banc-proof decisions in
            controversial cases, setting a dangerous
            precedent. ..................................................................... 11

    III.   The panel's opinion is egregiously wrong................................ 12

        A.    The panel mode of analysis makes it easy to
            validate gun laws. ........................................................ 13

        B.    The panel's "dangerousness" standard is either
            hopelessly vague or utterly deferential to
            Congress. ...................................................................... 15

        C.    The panel's pretrial detention analysis is
            historically inaccurate and logically flawed. ............... 18

CONCLUSION ........................................................................... 20

TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Def. Distributed v. Bonta,*
  No. CV 22-6200-GW-AGRX, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022)................................................................................ 17

*Env't Prot. Info. Ctr., Inc. v. Pac. Lumber Co.,*
  257 F.3d 1077 (9th Cir. 2001) ...................................... 2, 9, 10

*Gilligan v. Morgan,*
  413 U.S. 1, 9 (1973).............................................................. 11

*Greater New Orleans Broad. Ass'n v. United States,*
  527 U.S. 173 (1999) .............................................................. 4

*Kanter v. Barr,*
  919 F.3d 437 (7th Cir. 2019) (Barrett, J., dissenting) ......... 16

*Miller v. Gammie,*
  335 F.3d 889 (9th Cir. 2003)................................................. 7

*Nat'l Fam. Farm Coal. v. EPA,*
  29 F.4th 509 (9th Cir. 2022) ............................................... 12

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. 1 (2022)......................................................... passim

*Range v. Att'y Gen. United States of Am.,*
  69 F.4th 96 (3d Cir. 2023) (en banc)............................. passim

*Trump v. Hawaii,*
  583 U.S. 941 (2017).............................................................. 12

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship,*
  513 U.S. 18 (1994)........................................................... 4, 10

*United States v. Alaniz,*
  69 F.4th 1124 (9th Cir. 2023) ................................................................ 8

*United States v. Chovan,*
  735 F.3d 1127 (9th Cir. 2013*)* (Bea, J., concurring)............................ 16

*United States v. Daniels,*
  77 F.4th 337 (5th Cir. 2023) ................................................................ 5

*United States v. Hicks,*
  649 F. Supp. 3d 357 (W.D. Tex. 2023)................................................. 5

*United States v. Jackson,*
  69 F.4th 495 (8th Cir. 2023) ................................................................ 8

*United States v. Munsingwear, Inc.,*
  340 U.S. 36 (1950)............................................................................... 4

*United States v. Nutter,*
  624 F. Supp. 3d 636 (S.D.W. Va. 2022) .............................................. 5

*United States v. Payton,*
  593 F.3d 881 (9th Cir. 2010)...................................................... 3, 9, 11

*United States v. Price,*
  635 F. Supp. 3d 455 (S.D.W. Va. 2022) .............................................. 5

*United States v. Rahimi,*
  No. 22-915.................................................................................. passim

*United States v. Sanchez-Gomez,*
  584 U.S. 381 (2018).......................................................................... 7, 8

*Untied States v. Perez-Garcia,*
  96 F.4th 1166 (9th Cir. 2024) ....................................................... passim

iii

**Statutes** **Page(s)**

1 Cong. Ch. 9, April 30, 1790, 1 Stat. 112...............................................19

18 Pa. Cons. Stat. Ann. § 3929.1..............................................................20

18 U.S.C. § 1464 ...................................................................................20

**Other Authorities** **Page(s)**

Convention of the Suffrage men of Rhode Island, Vermont Gazette, Dec. 13, 1842.......................................................................................6

John Holmes, *The Statesman, or Principles of Legislation and Law* (1840) .................................................................................................6

The Compleat Constable 68 (3d ed. 1708 ..............................................6

Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461 (2009) .................19

# INTRODUCTION

In the Southern District of California, virtually every pretrial releasee—even those accused of mail theft, misdemeanor social security fraud, or smuggling counterfeit jeans—is ordered not to possess guns. No. 22-50134, Exh. C at 28-30. Jesus Perez-Garcia was among them. He was a licensed gun owner with no criminal history, who sometimes worked security jobs. He was riding in a car where drugs were found and was accused of being a courier. Neither he nor the driver had a gun. Exh. B. at 6-9, 27, 33. At the detention hearing, the government agreed that Mr. Perez-Garcia was not dangerous if released on conditions. Exh. C at 24. But like virtually all releasees, he was barred from gun possession even at home or work. *Id.* at 26. He and John Fencl, a releasee charged with a firearms registration offense, challenged that firearms condition under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

The case was argued in January 2023. That same day, the panel issued an order stating: "We affirm the district court's orders. An opinion explaining this disposition will follow." *United States v. Perez-Garcia*, 96 F.4th 1166, 1172 (9th Cir. 2024).

Months passed. No opinion materialized. Mr. Fencl went to trial and was sentenced. Mr. Perez-Garcia failed to appear at court hearings, and his bond was forfeited. Accordingly, appellants moved to dismiss the cases as moot, noting that to "render an opinion in spite of knowing

1

the cause was moot" would be "to flout the dictates of Article III." *Env't Prot. Info. Ctr., Inc. v. Pac. Lumber Co.,* 257 F.3d 1077 (9th Cir. 2001) (hereinafter, "EPIC").

Months later (14 months after affirmance), the panel issued a sweeping, 43-page opinion. The panel denied that *EPIC* controlled and held that it retained jurisdiction to "explain" its January order. *Perez-Garcia*, 96 F.4th at 1172–74. Then, the panel concluded that the historical practice of detaining capital defendants validated the conditions. *Id*. at 1182–86.

But though that was enough to decide the appeal, the panel also gave a second, independent reason for affirming: that the government may disarm *anyone* it deems too dangerous, irresponsible, or non-law-abiding to bear arms. *Id*. at 1186–91. The government has pressed this same argument in a diverse array of *Bruen* cases, including in *United States v. Rahimi*, pending at the Supreme Court.

The opinion overlaps significantly with the Solicitor General's petition for certiorari and merits brief in *Rahimi*, both of which were filed after the panel affirmed. Brief of the United States, *United States v. Rahimi*, No. 22-915 (Aug. 14, 2023) (hereinafter, *Merits Brief*); Petition for Certiorari, *Rahimi* (Mar. 17, 2023) (hereinafter, *Cert Petition*). The vast majority of the historical sources cited in these

2

filings appear in those filings. In contrast, only four of its cited sources appear in the government's brief here—unsurprising, as the government's "dangerousness" argument spanned less than three pages. That disconnect deprived the defense of any opportunity to respond to those points. Yet though the panel embraced the Solicitor General's views in *Rahimi*, it did not wait for the Supreme Court to rule on those views. The resulting opinion grants the government vast but ill-defined powers, while adopting an analysis that makes it easy to validate future gun laws.

This opinion transgressed bedrock principles of Article III, judicial restraint, and the adversary system, and it is egregiously wrong. It must be taken en banc.

ARGUMENT

This case is long moot. But despite the unusual procedural posture, this Court has options for correcting the panel's errors.

## I. The panel's overreach warrants equitable vacatur.

First, when a panel "refus[es] to vacate [a] decision after it has become moot," it is proper to "seek an en banc rehearing for the purpose of vacating [the] decision." *United States v. Payton*, 593 F.3d 881, 886 (9th Cir. 2010). Vacatur is an equitable remedy, *id*. at 885, used to "clear[] the path for future relitigation of the issues between the

3

parties," *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950), or in "exceptional circumstances." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 29 (1994). This unusual remedy is necessary here.

### A. As a second, independent, and unnecessary ground for the decision, the panel weighed in on the central question in a host of *Bruen* appeals.

It is "an established part of [federal] constitutional jurisprudence that [courts] do not ordinarily reach out to make novel or unnecessarily broad pronouncements on constitutional issues when a case can be fully resolved on a narrower ground." *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 184 (1999). Here, the panel initially decided the case on a narrow (though flawed, *see infra*) ground: that historical detention practices in capital cases validate disarming anyone facing "serious charges" today. *Perez-Garcia*, at 1182–86. That was enough to affirm. But the panel did not stop there. Instead, the panel gave a second, "separate ground" for approving the conditions: because there is a tradition of disarming anyone who is not a "law-abiding, responsible citizen," and specifically, those "deemed dangerous or unlikely to follow the sovereign's laws." *Id*. at 1186, 1188.

That argument—that diverse regulations support disarming the dangerous, irresponsible, or non-law-abiding—is the government's key defense for a host of gun laws. *See, e.g.*, *United States v. Daniels*, 77

F.4th 337, 350 (5th Cir. 2023) (§ 922(g)(3)); *United States v. Nutter*, 624 F. Supp. 3d 636, 645 (S.D.W. Va. 2022) (§ 922(g)(9)); *United States v. Hicks*, 649 F. Supp. 3d 357, 360 (W.D. Tex. 2023) (§ 922(n)); *United States v. Price*, 635 F. Supp. 3d 455, 459 (S.D.W. Va. 2022) (§ 922(k)). The government will therefore almost certainly argue that the panel's unnecessary holding in this moot case has resolved Second Amendment objections to hundreds of unrelated firearms prosecutions.

### B. Nearly all the panel's supporting historical sources appear in government filings in *Rahimi*; few appear in this case's briefs.

The panel's decision not to wait for *Rahimi* is especially perplexing, given the opinion's overlap in content with the Solicitor General's petition for certiorari and merits brief.

The Solicitor General in *Rahimi* urged the Supreme Court to decide that case on the exact ground adopted here. The merits brief's first argument heading reads: "The Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens." *Merits Brief* at 10. In particular, the Solicitor General urged that Congress may disarm the "dangerous" and those who "threaten public safety." *Id.* at 28 (simplified).

The historical evidence also aligns. The panel cited about 20 historical sources or law-review articles in its "law-abiding, responsible

citizens" section. Eighteen appear in the *Rahimi* materials. That includes obscure sources not found elsewhere, like a Rhode Island newspaper from 1842, Convention of the Suffrage men of Rhode Island, Vermont Gazette, Dec. 13, 1842; an 1840 legal treatise, John Holmes, *The Statesman, or Principles of Legislation and Law* (1840); and a long list of eighteenth-century justice-of-the-peace manuals, *e.g.*, The Compleat Constable 68 (3d ed. 1708).

In contrast, just four of the panel's sources were cited in the government's briefs here. No. 22-50314, Dkt. 14, at 15-17; No. 22-50316, Dkt. 16, at 16-18. They made no mention of key authorities, like the English Bill of Rights and the ratifying convention proposals, depriving the defense of any chance to respond. *Id*. These omissions are no surprise. In this bail appeal, the government's brief was capped at 5,600 words, and the reply was limited to 2,800 words. The government's briefs devoted less than three pages to the alleged tradition of "disarming the dangerous or untrustworthy." *Id*.

Issuing this opinion shortly before *Rahimi* will have serious consequences. In a month or two, when the Supreme Court decides *Rahimi*, panels in this circuit will not be able to adjudicate Second Amendment cases based on the best reading of that case. Rather, for every conclusion that the panel reached here—whether characterizing

6

particular historical laws, defining "danger," or evaluating historical evidence—panels will have to ask whether *Rahimi* is "clearly irreconcilable" with *Perez-Garcia*. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003). If not, they will have to defer to the panel's views over the Supreme Court's.

### C. No countervailing equitable considerations warrant a different conclusion.

The panel's countervailing equitable augments do not persuade.

First, the panel feared gamesmanship. *Perez-Garcia*, 96 F.4th at 1174. But that concern is implausible here. The defense has two ways to moot a pretrial-conditions appeal outside the normal course: (1) rush to trial, or (2) seek revocation. Both would severely prejudice the client. No ethical attorney would take them. No rational defendant would go along.

Second, the panel claimed that issuing an opinion was necessary to avoid waste or duplication, as conditions cases moot too quickly for thorough decision-making. *Id*. But the Supreme Court has reprimanded the Ninth Circuit for using these kinds of justifications to reach pretrial issues after they become moot. *See United States v. Sanchez-Gomez*, 584 U.S. 381, 387 (2018). In any case, this appeal was live for about 9 months. Other courts have brought *Bruen* cases from argument to decision in far less time. *Range v. Att'y Gen. United States of Am.,* 69

F.4th 96, 98 (3d Cir. 2023) (en banc) (4 months); *United States v. Jackson*, 69 F.4th 495, 500 (8th Cir. 2023) (1 month); *United States v. Alaniz*, 69 F.4th 1124, 1127 (9th Cir. 2023) (3 months). Notably, to counsel's knowledge, there are no other pretrial-release conditions appeals pending in this Court.

All of this points to the same conclusion. Respectfully, the panel did not live up to the values of judicial restraint. It reached this critical issue as (1) a second, independent, and unnecessary ground; (2) in a case with minimal briefing; (3) even though the case was moot. (4) It relied on historical arguments and sources to which the defense had no opportunity to respond. (5) And though the panel embraced the Solicitor General's arguments in *Rahimi*, it did not wait to hear the Supreme Court's views on those very arguments. That warrants vacatur.

## II.   The panel issued an advisory opinion in a long-moot case.

Second, this Court has jurisdiction to review the panel's own jurisdictional holding, namely, that it had power to issue a 43-page opinion in a moot case. *See Sanchez-Gomez*, 584 U.S. 381 (reviewing mootness in a moot case). This Court should do so, because issuing an advisory opinion in a moot case violates precedent and the Constitution.

8

### A. *EPIC* squarely holds that the panel had no Article III authority to issue this opinion.

The panel held that it retained jurisdiction to issue an opinion, because that opinion merely "explain[ed]" why the panel affirmed in January 2023. *Perez-Garcia*, 96 F.4th at 1172. But the law in this circuit is clear. Courts have discretion over whether to *withdraw* an opinion issued *before* a case becomes moot. *See, e.g.*, *Payton*, 593 F.3d at 885. But Article III prohibits courts from *issuing* opinions *after* a case becomes moot, even when the opinion explains a prior order.

The Court held as much in *EPIC*. There, a district court issued a preliminary injunction in September. *EPIC*, 257 F.3d at 1073. It learned in February that the case was moot. *Id.* at 1074. In March, it issued an opinion supporting the September injunction. *Id.* In May, it dismissed the case as moot and entered judgment. *Id.* It declined to vacate the March opinion, however, stating that that opinion "adjudicated the issues raised by the parties" in September. *Id.*

This Court reversed. "Article III of the Constitution prohibits federal courts from taking further action on the merits in moot cases," the Court explained. *Id.* at 1076. "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Id.* (simplified). Thus,

to "render an opinion in spite of knowing the cause was moot" is "to flout the dictates of Article III." *Id*. at 1077. This Court accordingly vacated the "order, filed after the case had become moot, outlining the district court's reasons for granting [the] preliminary injunction," instructing that the court "vacate its statements on the merits of EPIC's case made after there was no longer an Article III case or controversy." *Id*. at 1073. *EPIC*, then, squarely holds that courts lack Article III authority to "outlin[e] . . . reasons" for issuing a prior order or make "statements on the merits" after a case moots—exactly what the panel did here.

The panel's footnote distinguishing *EPIC* is unpersuasive and factually wrong. *Perez-Garcia*, 96 F.4th at 1173 n.6. The district court in *EPIC* did not issue the opinion after judgment, but months before. *EPIC*, 257 F.3d at 1077 (vacating March opinion); *id*. at 1074 (judgment issued in May). And though *EPIC* addressed whether the appellant had standing, this Court concluded that he did because the judge injured him by issuing an opinion after losing Article III jurisdiction. *Id*. The Article III holding was therefore essential to the result.

*EPIC* is not just binding. It is also correct. "If a judgment has become moot while awaiting review, [a] Court may not consider its merits." *U.S. Bancorp*, 513 U.S. at 21 (simplified). Courts may only

10

perform functions "reasonably ancillary to the primary, dispute-deciding function of the federal courts," like awarding costs, ordering dismissal, or vacating an opinion. *Id*. at 21–22 (simplified). Issuing a 43-page opinion is not administrative or ancillary but squarely implicates a court's dispute-deciding function.

Indeed, dispute-settling for future cases was the panel's explicit aim: It wanted to give "the legal community as a whole of the benefit of an appellate court decision that adjudicated properly presented questions concerning specific constitutional rights." *Perez-Garcia*, 96 F.4th at 1174 (simplified). But to "adjudicate[e]" a "question[]" that has been "mooted by subsequent developments" is to issue an advisory opinion. *Gilligan v. Morgan*, 413 U.S. 1, 9 (1973). Judges cannot cross that Article III limit, no matter how strong the desire to settle Second Amendment questions.

**B.  The panel's procedure creates a blueprint for issuing expansive, en-banc-proof decisions in controversial cases, setting a dangerous precedent.**

Preventing courts from issuing post-mootness opinions is not just compelled by precedent and the Constitution. It is also prudent.

In normal circumstances, a sweeping Second Amendment opinion would be ripe for en banc merits review. But the panel's procedure removes that option. By issuing a two-sentence order before the case

11

mooted, the panel purported to lock in its own jurisdiction. *Perez-Garcia*, 96 F.4th at 1172–74. But because the opinion issued after the case mooted, en banc merits review is off the table. *See Payton*, 593 F.3d at 886 (holding that after mootness, one cannot seek "en banc rehearing in order to obtain a different decision on the merits"). Thus, at worst, a panel in these circumstances will see its opinion vacated. At best, the opinion will serve as unassailable precedent until another case reaches the en banc stage. In these circumstances, why not go big?

These incentives may not have motivated this panel in any way. But they set a dangerous precedent. Many far-reaching and controversial cases have a high probability of mooting, including those involving executive orders and administrative actions. *See, e.g.*, *Trump v. Hawaii*, 583 U.S. 941 (2017); *Nat'l Fam. Farm Coal. v. EPA*, 29 F.4th 509, 511 (9th Cir. 2022). The panel's opinion provides a blueprint for en-banc-proof decision-making in moot cases. The temptation to follow that blueprint in the future may exert a stronger pull than the more modest virtues of judicial restraint. This Court should reaffirm that this imprudent procedure is not available in this circuit.

## III.   The panel's opinion is egregiously wrong.

Third, if—as the government has previously argued, Dkt. 25 at 4—this case is not moot at all, the Court may revisit the panel's

12

decision on the merits. There is not space in this filing for detailed rebuttal of *Perez-Garcia*'s historical conclusions, though that history has been extensively briefed in other cases. *E.g.*, *Duarte*, No. 22-50048; *Rojo*, No. 23-598. But some overarching problems bear mention.

## A. The panel mode of analysis makes it easy to validate gun laws.

As an initial matter, *Perez-Garcia*'s mode of analysis is irreconcilable with *Bruen* in three respects. First and foremost, *Perez-Garcia* departed from *Bruen*'s requirement that the government identify historical regulations "distinctly similar" or at least "relevantly similar" to the modern law. *Bruen*, 597 U.S. at 26–31. Instead, the opinion bundled together a wide variety of regulations (the English Bill of Rights, revolutionary loyalty-oath statutes, laws criminalizing spreading terror with arms, etc.), which bear little resemblance to pretrial release conditions or one another. *Perez-Garcia*, 96 F.4th at 1186–91. Based on these disparate regulations of discrete groups, the panel derived a broader principle: that Congress may disarm *any* group deemed too dangerous, irresponsible, or non-law-abiding to bear arms. *Id.*

*Bruen* squarely rejected that generalization maneuver. In *Bruen*, New York showed that historical legislatures outlawed several kinds of public carry, including with affray laws, sensitive places laws, surety

13

statutes, and concealed carry laws. 597 U.S. at 30–69. From these specifics, New York derived a generalized power to regulate public carry. *Id*. at 33.

*Bruen* rejected that approach. Instead, it individually evaluated each law to determine whether it was sufficiently similar to the "proper cause" requirement. *Id*. at 30–69. And *Bruen* refused to conduct the analysis at a sky-high level of abstraction. For instance, the Court declined to "expand[] the category of 'sensitive places' simply to *all* places of public congregation that are not isolated from law enforcement," as that would "define the category of 'sensitive places' far too *broadly*." *Id*. at 2134 (emphasis added). Because "[a] survey of Anglo-American history" revealed only a small number of "well-defined" restrictions on public carry, New York could not extrapolate to a general power to regulate public carry. *Id*. at 38–39. Yet that is exactly the kind of analysis performed here.

Second, despite acknowledging that appellants had made various arguments for why certain regulations were not part of American tradition or were too dissimilar, the panel felt no need to explain why those arguments were wrong. *Perez-Garcia*, 96 F.4th at 1191. Instead, the opinion dismissed them all out of hand, indicating that that kind of detailed analysis amounted to an improper "divide-and-conquer

14

approach." *Id*. That is irreconcilable with the *Bruen* opinion, the entirety of which is devoted to detailed, individualized comparison to particular historical laws. 597 U.S. at 30–69.

Third, though *Bruen* repeatedly states that the government must show a historical tradition of "regulation," *e.g.*, *id*. at 17, 24, 26–29, *Perez-Garcia* held the government is not limited to regulations at all. The opinion uses sources like newspaper editorials, employee manuals, and rejected proposals as authorities on the Second Amendment. *Perez-Garcia*, 96 F.4th at 1188, 1191.

The end result is to interpret the *Bruen* test to set an exceedingly low bar. As long as the government can come up with an adjective that links a modern law to some historical laws (or editorials, or private letters, etc.), the modern law is valid. That is not how *Bruen* teaches us to evaluate the Second Amendment.

## B. The panel's "dangerousness" standard is either hopelessly vague or utterly deferential to Congress.

Perhaps because its analysis required sweeping generalization, *Perez-Garcia* gives a nebulous description of whom the government can disarm. Per the opinion, the government may disarm anyone who is not a "law-abiding, responsible citizen," including those who "pose an unusual danger, beyond the ordinary citizen." *Id*. at 1186.

15

That standard is hopelessly vague and unworkable. *See Range*, 69 F.4th at 102. What acts prevent a person from being "law-abiding"? "Why not all misdemeanors? Why not minor infractions?" *United States v. Chovan*, 735 F.3d 1127, 1148 (9th Cir. 2013) (Bea, J., concurring). And what about the term "responsible"? "In our Republic of over 330 million people, Americans have widely divergent ideas about what is required for one to be considered a 'responsible' citizen." *Range*, 69 F.4th at 102. And as for danger, "[t]he government could quickly swallow the [Second Amendment] if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun." *Kanter v. Barr*, 919 F.3d 437, 465 (7th Cir. 2019) (Barrett, J., dissenting).

Appellants here are cases in point. When the magistrate judge imposed the firearms condition on Mr. Perez-Garcia, all she knew was that the government had accused him of helping transport drugs (and not even as the driver). *See* Exh. B at 6. She imposed the condition even though he (1) had a concealed-carry license, (2) worked security, (3) had no criminal history, (4) did not have a gun or act violently during the offense, and (5) was presumed innocent. *Id*. at 6–9, 27, 33. And while the panel made much of her individualized evaluation, it elsewhere acknowledged powerful evidence that no individualization occurs in the

16

Southern District. *Perez-Garcia*, 96 F.4th at 1181 n.13. Everyone has the condition, even Levi's counterfeiters and social security misdemeanants. Exhibit C at 29-31. In short: If Mr. Perez-Garcia sets the bar for danger, that bar is exceedingly low.

As for Mr. Fencl, *Perez-Garcia*'s analysis of dangerousness turns on the *number* of arms he owned—not their legality. *Id.* at 1171. Rhetoric about ghost guns and grenades may give the impression that Mr. Fencl had an arsenal of illegal arms. But to this day, the government has not tried to prove that any firearms in his collection violated any law, state or federal, besides the unregistered items. (Hence why Mr. Fencl received a six-month sentence post-trial. No. 21-CR-3101, Dkt. 178.) In particular, homemade firearms were not outlawed in California until after Mr. Fencl's arrest.[1] *Def. Distributed v. Bonta*, No. CV 22-6200-GW-AGRX, 2022 WL 15524977, at *2 (C.D. Cal. Oct. 21, 2022) (describing 2022 ghost-gun law). All this sends a troubling message: Best limit your exercise of Second Amendment rights, or we'll have reason to take them away.

--------

[1] The panel also mistakenly claims that Mr. Fencl was on probation. *Id.* at 1171. The government conceded below the police violated the Fourth Amendment by raiding his home under the misimpression that he was a probationer.

17

Under *Perez-Garcia*'s test, then, how is a court to decide if someone is sufficiently dangerous to warrant total Second Amendment deprivation? If the panel has an answer, it is total deference to Congress. "Congress[]," says the opinion, has "historical legislative power to disarm those who are *judged* to be a threat to the public safety." *Perez-Garcia*, 96 F.4th at 1189 (simplified) (emphasis added). As long as an individual is "*deemed* dangerous or unwilling to follow the law," they can be completely disarmed. *Id.* at 1192 (emphasis added).

*Perez-Garcia* therefore puts us back where we started before *Bruen*: with "deference to legislative interest-balancing." 597 U.S. at 26. This "extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label." *Range*, 69 F.4th at 102–03 (simplified). It also defeats the whole point of "enshrin[ing] [a] constitutional right[]," which is to "take[] certain policy choices off the table." *Id.* (simplified). This Court should at least wait to hear what the Supreme Court has to say about this argument in *Rahimi* before reaching that striking conclusion.

## C. The panel's pretrial detention analysis is historically inaccurate and logically flawed.

Finally, the panel's analogy to pretrial detention for capital crimes also includes serious flaws.

18

First, the panel did not provide evidence for this section's foundational premise: that "most" founding-era serious crimes were death-eligible.[2] And history shows the opposite. For instance, the First Congress defined 18 crimes. Just 8 were punishable by death. 1 Cong. Ch. 9, April 30, 1790, 1 Stat. 112. Non-capital offenses included misprison of treason, manslaughter, and intentional maiming. *Id.* §§ 2, 7, 13. That mirrors trends in the states. Within two decades of independence, they "had replaced execution with incarceration as the punishment for all but a few crimes." Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 468 (2009).

Second, *Perez-Garcia* did not attempt to define which crimes were sufficiently "serious" to warrant comparison to capital offenses. 96 F.4th at 1182. Does it include all felonies? If not, how are judges to decide without reverting to impermissible interest-balancing? *See Bruen*, 597 U.S. at 25 (2022).

A third problem arises if the panel did mean to equate all modern felonies with historical capital crimes. The word "felony" today encompasses many more, and much less serious, crimes than it did at

---

[2] Instead, the panel cited assertions in judicial opinions; Blackstone's characterization of English law; and individual examples of capital crimes. *Perez-Garcia*, 96 F.4th at 1182–86.

the founding. *See Range*, 69 F.4th at 102. To analogize death-eligible crimes to offenses like library theft or radio obscenity makes little sense. *See id.* at 102 n.5 (citing 18 Pa. Cons. Stat. Ann. § 3929.1 and 18 U.S.C. § 1464). These serious flaws provide an additional ground for vacatur.

## CONCLUSION

For the foregoing reasons, this Court must grant the petition.

Respectfully submitted,

DATED: May 11, 2024       *s/Katie M. Hurrelbrink*
Katie M. Hurrelbrink
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101
619.234.8467
Katie_Hurrelbrink@fd.org

Attorneys for Appellants

# CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Circuit Rule 35-4 or 40-1, the attached petition for panel rehearing is prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and contains 4,186 words.

Respectfully submitted,

DATED: May 11, 2024          *s/Katie Hurrelbrink*
                             Katie Hurrelbrink
                             Federal Defenders of San Diego, Inc.
                             225 Broadway, Suite 900
                             San Diego, California 92101
                             619.234.8467
                             Katie_Hurrelbrink@fd.org

                             Attorneys for Appellants