**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-50314 |
| *Plaintiff-Appellee*, | D.C. No. 3:22-cr-01581-GPC-2 |
| v. | |
| JESUS PEREZ-GARCIA, | |
| *Defendant-Appellant*. | OPINION |

Appeal from the United States District Court
for the Southern District of California
Gonzalo P. Curiel, District Judge, Presiding

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-50316 |
| *Plaintiff-Appellee*, | D.C. No. 3:21-cr-03101-JLS-1 |
| v. | |
| JOHN THOMAS FENCL, | |
| *Defendant-Appellant*. | |

Appeal from the United States District Court
for the Southern District of California
Janis L. Sammartino, District Judge, Presiding

Argued and Submitted January 26, 2023
San Francisco, California

Filed March 18, 2024

Before:  Kim McLane Wardlaw, Richard R. Clifton, and
Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge Sanchez

---

## SUMMARY[*]

---

### Criminal Law

In consolidated appeals from district court orders subjecting two defendants (Appellants) to a condition of pretrial release that temporarily barred them from possessing firearms pending trial, the panel denied Appellants' motion to dismiss the appeals as moot, and provided its full rationale for its previous order affirming the district court's orders.

The panel declined to dismiss the appeal as moot for four reasons:  the case is not moot in the jurisdictional sense, the opinion is not advisory, equity weighs in favor of denying the motion, and dismissal would likely force later panels to duplicate the panel's efforts while confronting the exact same issues.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Appellants contended that the pretrial firearm condition violates their Second Amendment rights under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). Disagreeing, the panel held that the Bail Reform Act of 1984's firearm condition on pretrial release is constitutional as applied to Appellants. The panel explained that its holding is consistent with how courts have long balanced the constitutional rights of pretrial detainees and releasees with legitimate public safety and logistical considerations, and is consistent with our nation's long history of temporarily disarming criminal defendants facing serious charges and those deemed dangerous or unwilling to follow the law.

---

**COUNSEL**

Zachary Howe (argued), Daniel E. Zipp, and Patrick C. Swan, Assistant United States Attorneys, United States Attorney's Office, San Diego, California, for Plaintiff-Appellee.

Katherine M. Hurrelbrink (argued), Assistant Federal Public Defender, Federal Defenders of San Diego Inc., San Diego, California, for Defendant-Appellant.

Daniel L. Kaplan, Assistant Federal Public Defender; John M. Sands, Federal Public Defender, District of Arizona; Federal Public Defender's Office, Phoenix, Arizona; Carmen Smarandoiu, Appellate Chief; Jodi Linker, Federal Public Defender, Northern District of California; Federal Public Defender's Office, San Francisco, California; for Amici Curiae Ninth Circuit Federal Public and Community Defenders.

Ellora T. Israni and Ryan Downer, Civil Rights Corps, Washington, D.C., for Amicus Curiae Civil Rights Corps.

Adam Kraut, Second Amendment Foundation, Bellevue, Washington; Joseph G.S. Greenlee, FPC Action Foundation, Las Vegas, Nevada; C.D. Michel, Michel & Associates P.C., Long Beach, California; John W. Whitehead, The Rutherford Institute, Charlottesville, Virginia; for Amici Curiae Firearms Policy Coalition, FPC Action Foundation, Second Amendment Law Center, California Rifle & Pistol Association, Second Amendment Foundation, Rutherford Institute, and Cato Institute.

**OPINION**

SANCHEZ, Circuit Judge:

John Thomas Fencl was arrested after police officers found more than 110 guns in his house, including 10 unregistered and untraceable "ghost guns," 4 silencers, and 3 short-barreled rifles. Officers also uncovered thousands of rounds of ammunition, including armor-piercing and incendiary rounds and a tear-gas grenade. Jesus Perez-Garcia was arrested following a customs inspection at the United States-Mexico border. He was the passenger in a car in which officers found approximately eleven kilograms of methamphetamine and half a kilogram of fentanyl. Both men were charged with multiple felony offenses.

Consistent with the Bail Reform Act of 1984, two magistrate judges released Fencl and Perez-Garcia pending their trials but subjected them to a condition of pretrial release that temporarily barred them from possessing

firearms pending trial.  *See* 18 U.S.C § 3142 (c)(1)(B)(viii).
The magistrate judges concluded that the firearm condition
was the least restrictive way to assure the safety of the
community and the defendants' appearances in court.  *Id.*
§ 3142(c)(1)(B).  Two district court judges agreed.

In these consolidated appeals, Appellants Fencl and
Perez-Garcia contend that the pretrial firearm condition
violates their Second Amendment rights under *New York
State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).
We disagree.  We conclude that the Government has met its
burden of showing that Appellants' temporary disarmament
is consistent with our nation's historical tradition of firearm
regulation.    We previously affirmed the district courts'
orders on that basis, *see* Order Dated January 26, 2023, and
we now provide our full rationale.

## I.

John Fencl was arrested in June 2021 after officers found
more than 110 guns in his house.  Discovered in the search
were 10 "ghost guns," 4 silencers, 3 short-barreled rifles, and
thousands of rounds of ammunition, including armor-
piercing and incendiary rounds and a tear-gas grenade.  This
was not Fencl's first transgression for unlawful gun
possession.  He pleaded guilty to a misdemeanor firearm
offense in 2019 after officers arrested him for unlawful
possession of a concealed firearm without a license.  He was
arrested again in April 2021 for possession of a concealed
firearm, a privately made ghost gun, while he was on
probation.  A few months after his June 2021 arrest, Fencl
was charged with felony unlawful possession of three
unlicensed short-barreled rifles and four unlicensed silencers
in violation of 26 U.S.C. § 5861(d).  If convicted on all seven
counts, he faces up to 70 years in prison.  *See id.* § 5871.

Fencl sought pretrial release, which the magistrate judge granted at a bond hearing. His release was subject to various conditions, including the following: "The defendant must not possess or attempt to possess a firearm, destructive device, or other dangerous weapon" and "must legally transfer all firearms, as directed by Pretrial Services."[1] The firearm condition effectively barred Fencl from possessing any firearms pending his trial. Shortly after the Supreme Court decided *Bruen*, Fencl filed a motion challenging the constitutionality of the firearm condition. He sought to remove the condition so that he could carry guns when he traveled out of state for work and to protect his home. The magistrate judge denied his motion, and the district court affirmed.

In June 2022, Perez-Garcia was arrested following a customs inspection at the United States-Mexico border. He was the passenger in a car in which officers found approximately eleven kilograms of methamphetamine and half a kilogram of fentanyl. The Government charged him with two counts of importing controlled substances in violation of 21 U.S.C. §§ 952, 960. At his bond hearing, Perez-Garcia was granted pretrial release subject to various conditions, including a substantially similar firearm condition as the one imposed on Fencl. Shortly after *Bruen* was issued, Perez-Garcia filed a motion to modify his conditions of pretrial release to remove the firearm condition. He wanted access to firearms so that he could pursue employment as an armed security officer and to protect his family. The magistrate judge denied his motion, and the district court affirmed.

---

[1] The magistrate judge modified the firearm condition to prohibit Fencl from possessing gun parts as well.

These consolidated appeals followed. We have jurisdiction pursuant to 18 U.S.C. § 3145(c) and 28 U.S.C. § 1291. We review *de novo* the constitutionality of pretrial release conditions under the Bail Reform Act. *See United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990). We may affirm the order on any ground supported by the record, even if it differs from the rationale of the district court. *See Opara v. Yellen*, 57 F.4th 709, 721 (9th Cir. 2023).

## II.

Before reaching the merits of Appellants' claims, we address Appellants' motion to dismiss their consolidated appeals on the basis of mootness. The Government opposes the motion. We decline to dismiss the appeals for the reasons explained below.

In December 2022, Perez-Garcia and Fencl filed appeals of the denials of their respective motions to modify their conditions of pretrial release under Federal Rule of Appellate Procedure 9(a).[2] The parties fully briefed and argued the appeals in the following weeks. On January 26, 2023, we ruled against Fencl and Perez-Garcia in a consolidated, dispositive order stating, "We affirm the district court's orders. An opinion explaining this disposition will follow." It is not uncommon for appellate courts to resolve urgent motions by filing an expedited and summary order, later to be followed by an opinion that provides the reasoning underlying the order. *See, e.g.*, *Friends of the Inyo v. U.S. Forest Serv.*, No. 23-15492, 2023 WL 5541555, at \*1 (9th Cir. Aug. 25, 2023) (issuing an order because "an

---

[2] Federal Rule of Appellate Procedure 9(a) requires the courts of appeals to "promptly determine" such appeals, and they were referred to a motions panel of the court.

immediate ruling is warranted" and noting that "[a]n opinion will follow in due course").[3]

Fencl and Perez-Garcia moved to dismiss their appeals as moot after we ruled against them but before we provided our reasoning. In the time since we filed our dispositive order on January 26, 2023, Fencl was convicted at trial and Perez-Garcia's bond was revoked for repeatedly failing to appear for hearings.[4] Because neither Fencl nor Perez-Garcia remain on pretrial release, they contend that we now lack jurisdiction to explain our dispositive order because their challenges to their pretrial release conditions are moot.

We have explained that "[t]here is a significant difference between a request to dismiss a case or proceeding for mootness prior to the time an appellate court has rendered its decision on the merits and a request made after that time." *Armster v. U.S. Dist. Ct. for the Cent. Dist. of Cal.*, 806 F.2d 1347, 1355 (9th Cir. 1986). The former scenario implicates limitations on our constitutional power because Article III does not give federal courts constitutional authority to decide moot cases. *See id.* But when mootness arises after a "valid decision" has already been rendered, "we are not precluded from exercising [A]rticle III power." *Id.* Rather, we may exercise our discretion to determine whether the case should

---

[3] *See also Where Do We Go Berkeley v. Cal. Dep't of Transp.*, No. 21-16790, 2022 WL 1196712, at *1 (9th Cir. Apr. 19, 2022); *United States v. Gainza*, 827 F. App'x 730 (9th Cir. 2020); *All. for Wild Rockies v. Cottrell*, 385 F. App'x 683, 684 (9th Cir. 2010); *Santiago v. Rumsfeld*, 403 F.3d 702, 702 (9th Cir. 2005).

[4] Fencl's case went to trial and he was convicted on October 27, 2023. Perez-Garcia failed to appear for district court hearings on February 21, 2023, and March 6, 2023. As a result, the district court issued an arrest warrant and granted the Government's oral motion to revoke his bond. Perez-Garcia's bond was forfeited in May 2023.

be dismissed based on equitable and pragmatic considerations. *See United States v. Payton*, 593 F.3d 881, 885 (9th Cir. 2010); *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 590 F.3d 725, 728 (9th Cir. 2009).**[5]**

We deny Appellants' motion to dismiss for four reasons. First, the case is not moot, at least in the jurisdictional sense. We already heard and conclusively resolved the merits of Appellants' appeal in a dispositive order, and no party disputes that we had jurisdiction when we decided this case. An event occurring "after our decision had been rendered does not deprive this court of jurisdiction retroactively." *Dickens v. Ryan*, 744 F.3d 1147, 1148 (9th Cir. 2014) (en banc) (alterations adopted and internal quotation marks omitted); *see also Humphreys v. Drug Enf't Admin.*, 105 F.3d 112, 115 (3d Cir. 1996) (denying motion to dismiss appeal where the court "heard and determined the merits of the appeal" when "there was indisputably a live controversy between the parties").

Second, this opinion is not advisory because it addresses "properly presented questions concerning . . . specific constitutional rights." *Armster*, 806 F.2d at 1355. By publishing the reasoning underlying our prior order, we merely explain the basis for our decision and do not take further action on the merits of Appellants' claims. We are

---

[5] Appellants' motion to dismiss the appeal as moot is effectively a motion to vacate a prior decision issued while there was a live case or controversy. *See Armster*, 806 F.2d at 1355. When Appellants filed their motions to dismiss, we had already issued our order on January 26, 2023, which conclusively resolved the merits of their pending appeals. Appellants do not dispute that this court had jurisdiction when we issued that "valid decision." *Id.* Were we to dismiss this case as moot now, we would in effect be "vacat[ing] a decision we have already issued." *See id.*

not the only appellate court to follow this practice. *See, e.g*., *Romeu v. Cohen*, 265 F.3d 118, 122 (2d Cir. 2001) (explaining a prior order that denied a Puerto Rico resident's request for a New York absentee ballot even though the election took place months before the opinion issued); *United States v. Int'l Bhd. of Teamsters*, 955 F.2d 171, 174 (2d Cir. 1992) (publishing opinion promised in prior order despite termination of dispute following issuance of the order); *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 839 F.2d 1296, 1299–1301 & n.1 (8th Cir.) (explaining a prior order that permitted an election to proceed months after the election took place), *cert. denied*, 488 U.S. 869 (1988).

The Second Circuit has explained that this appellate practice of bifurcating an expedited order with its reasoning is common, often necessary, and constitutional. *See Hassoun v. Searls*, 976 F.3d 121, 129 & n.4, 130 (2d Cir. 2020) ("Because the court's opinion explained its previous order—which addressed a live case or controversy—the opinion was not advisory."); *In re Grand Jury Investigation*, 399 F.3d 527, 528 n.1 (2d Cir. 2005). We agree. Our decision to publish this opinion to explain a prior order that fully adjudicated the merits of Appellants' claims does not render the opinion advisory.**[6]**

---

[6] Appellants contend that our decision in *Environmental Protection Information Center, Inc. v. Pacific Lumber Co.*, 257 F.3d 1071 (9th Cir. 2001), requires us to dismiss their appeals as moot. We do not find that case controlling. In that case, Pacific Lumber Company asked us to vacate statements made by the district court in its opinion granting Pacific Lumber's motion to dismiss the case as moot in which the district court outlined reasons for previously granting a preliminary injunction against Pacific Lumber. *Id.* at 1073. The question before us was whether

USA V. PEREZ-GARCIA                    11

Third, equity weighs in favor of denying Appellants'
motion. Were we to dismiss Appellants' appeals and not
issue this opinion, we would deprive the legal community as
a whole of "the benefit of an appellate court decision that
adjudicated properly presented questions concerning . . .
specific constitutional rights." *Armster*, 806 F.2d at 1355;
*accord Dickens*, 744 F.3d at 1148. That is especially true
here since Appellants are challenging the common,
statutorily authorized practice of imposing firearm
restrictions as a condition of pretrial release.

We are also mindful that dismissal at this stage could
incentivize parties to strategically prevent the publication of
a decision adverse to their interests. Here, Appellants seek
dismissal only "[a]fter seeing the proverbial writing on the
wall" in our previously filed expedited order. *Naruto v.
Slater*, 888 F.3d 418, 421 n.3 (9th Cir. 2018). Allowing
parties to file appeals "seek[ing] the benefits of a favorable
judicial decision"—and using considerable public resources
in the process—only to later obtain dismissal to "escape
some of the more significant adverse consequences of an
unfavorable judgment," would not serve the interests of
justice or judicial economy. *Armster*, 806 F.2d at 1356; *see
also Albers v. Eli Lilly & Co.*, 354 F.3d 644, 646 (7th Cir.
2004) (per curiam) ("One good reason to exercise discretion
against dismissal is to curtail strategic behavior.").

---

Pacific Lumber was an "aggrieved" party with standing to request an
appellate court to vacate statements made by the lower court after it had
rendered judgment in Pacific Lumber's favor. *Id.* We answered in the
affirmative and remanded to the lower court to vacate its statements on
the merits made after it entered judgment dismissing the case as moot.
*Id.* at 1077. We said nothing about an appellate court's discretionary
authority after rendering a decision on the merits but before a mandate
issues. *See Armster*, 806 F.2d at 1355.

12          USA v. PEREZ-GARCIA

Fourth, and finally, dismissal would not be pragmatic because it would likely force later panels to duplicate our efforts while confronting the exact same issues. In light of the extensive and complicated historical analysis the Second Amendment now demands, cases involving Second Amendment challenges to temporary pretrial conditions could resolve before an appellate court has the opportunity to issue a thorough opinion. *See Bruen*, 597 U.S. at 111 (Breyer, J., dissenting) (explaining how the difficulties attendant to extensive historical analysis are "especially acute" in the lower courts, which have fewer research resources, less assistance from *amici* historians, and higher caseloads). If we do not resolve this issue now, we might preclude efficient judicial review of a likely recurring constitutional challenge to application of the Bail Reform Act. *See Armster*, 806 F.2d at 1360; *Int'l Bhd. of Teamsters*, 955 F.2d at 174 (declining to dismiss appeal and publishing explanatory opinion in moot case because the issues presented were "of general and recurring applicability"). We decline to do so. We exercise our discretion to deny Appellants' opposed motion to dismiss their own appeals, and we proceed to the merits.

**III.**

The district courts' authority to impose conditions on Appellants' pretrial release stems from the Bail Reform Act of 1984. *See* 18 U.S.C. §§ 3141–3156. Congress passed that law to respond to "the alarming problem of crimes committed by persons on release." *United States v. Salerno*, 481 U.S. 739, 742 (1987) (citation omitted). The purpose of the statute was to give courts authority to make release decisions that recognize "the danger a person may pose to others if released." *Id.* (citation omitted).

The Bail Reform Act authorizes federal courts to release defendants awaiting trial subject to specific conditions that "protect the community from the risk of crimes [they] might commit while on bail." *United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006). Courts have discretion to choose which conditions will best keep the community safe. 18 U.S.C. § 3142(c)(1)(B).[7] Some conditions necessary to keep the community safe nevertheless burden constitutional rights. For example, the Bail Reform Act explicitly authorizes release conditions that restrict a defendant's constitutional right to personal association, travel, speech directed at a victim or witness, or, at issue here, the possession of firearms. *See id.* § 3142 (c)(1)(B)(i)-(xiv).

The Bail Reform Act balances the burdens imposed on criminal defendants' rights with safeguards designed to ensure that any restrictions imposed are narrowly tailored. Any condition imposed on a criminal defendant must be "the least restrictive" way to "reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id.* § 3142(c)(1)(B). And any such condition must be justified by a showing that the defendant poses a "heightened risk of misbehaving while [released] on bail" pending trial. *Scott*, 450 F.3d at 874. In sum, the Bail Reform Act offers pretrial detainees freedom pending trial in exchange for abiding by a number of conditions designed

---

[7] To determine which conditions should be imposed, the Bail Reform Act directs a judicial officer to consider the following: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the person, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(1)-(4).

to protect the public and secure the attendance of the accused at trial. *See id.* at 887-88 (Bybee, J., dissenting).

## IV.

Appellants contend that the Bail Reform Act's firearm condition violates their Second Amendment rights because it prohibits them from possessing guns while they are released pending trial. As we explain in more detail below, the Supreme Court recently clarified in *Bruen* that the government bears the burden of showing that *any* regulation infringing on Second Amendment rights is consistent with this nation's historical tradition of firearm regulation. 597 U.S. at 17. The Supreme Court specifically rejected the use of interest-balancing and means-end scrutiny and instead held that the Second Amendment's text, history, and tradition are the "[o]nly" avenues to justify a firearm regulation. *Id.*

The Government argues that the Bail Reform Act's restriction on Appellants' firearm possession is justified not by the Second Amendment's text, history, or tradition, but by the Government's own "regulatory interest in community safety." In its view, the Supreme Court's decision in *Salerno*—not *Bruen*—controls and therefore forecloses Appellants' Second Amendment challenge. The Government's position, however, relies on a misreading of *Salerno* and cannot be squared with *Bruen*.

In *Salerno*, the Supreme Court concluded that the Bail Reform Act's provisions authorizing pretrial detention did not, on their face, violate the Constitution's Due Process and Excessive Bail Clauses. *See* 481 U.S. at 750-51, 755. Consistent with the Court's due process jurisprudence, *Salerno* rejected the due process challenge by balancing the accused's fundamental interest in liberty against the

government's interest in preventing danger and flight. *Id*. at 750-51; *see also id.* at 748 ("We have repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest."). *Salerno* then rejected the argument that the Eighth Amendment only allows the government to restrict bail solely based on the defendant's risk of flight. *See id.* at 753-55. *Salerno* "intimate[d] no view on the validity of any [other] aspects of the Act." *Id*. at 745 n.3.

The Government argues that because *Salerno* already held that the Government's regulatory interest in community safety authorizes pretrial detention—which is a total deprivation of liberty—it follows that any lesser deprivations of liberty, such as the firearm pretrial release condition at issue here, must also pass constitutional muster if reasonably necessary to prevent danger to the community. Just as an indictment can justify restrictions on Fourth, Fifth, and Sixth Amendment rights, the Government contends, "then [it] can also justify the restriction of a defendant's Second Amendment rights as a temporary and judicially authorized condition of pretrial release."  As the Government sees it, *Bruen* did not alter the balance *Salerno* already struck nor require that courts accord Second Amendment rights special consideration.  The Government invites us to "uphold the challenged condition without proceeding further" under a *Bruen* analysis.

The Government reads too much from *Salerno*.  In upholding the Bail Reform Act's pretrial detention provisions from facial challenge on Fifth and Eighth Amendment grounds, the Supreme Court did not conclude nor imply that criminal defendants released pending trial lose their right to challenge the constitutionality of pretrial release conditions simply because detention might otherwise

be permitted under an interest-balancing analysis. Nor does *Salerno*'s due process analysis impose a one-size-fits-all model of constitutional inquiry on all challenges to conditions of pretrial detention or release under the Bail Reform Act.

For example, when a criminal defendant in *Scott* challenged their pretrial release condition authorizing suspicionless searches or drug testing, we applied traditional Fourth Amendment analysis to assess whether these conditions were unreasonable searches or seizures. *See, e.g.*, *Scott*, 450 F.3d at 868-69. Similarly, when a class of pretrial detainees challenged a pretrial detention condition requiring them to expose their body cavities as a part of a strip search in *Bell*, the Supreme Court applied traditional Fourth Amendment analysis to these claims. *See Bell v. Wolfish*, 441 U.S. 520, 558 (1979). In *Bell*, the Supreme Court also applied First Amendment analysis to a different claim involving a pretrial detention condition prohibiting detainees from receiving hardback books. *See id.* at 550.

On the other hand, when a class of undocumented pretrial detainees raised a substantive due process challenge to an Arizona law that categorically forbade them from obtaining any form of bail or pretrial release, we applied *Salerno*'s interest-balancing substantive due process framework to assess whether the law comported with the Due Process Clause of the Fourteenth Amendment. *See Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014). The point is that federal courts have not analyzed every constitutional challenge to a condition of pretrial detention or release under the Bail Reform Act by applying the same interest-balancing approach the Supreme Court applied in *Salerno*. We see no reason to apply the Government's one-size-fits-all approach here.

After all, Appellants contend that the Bail Reform Act's firearm condition violates their Second Amendment rights, not their due process protection against punishment before conviction or their Eighth Amendment protection against excessive bail. And *Bruen* makes clear that text, history, and tradition are the "[o]nly" ways the Government can justify a regulation that implicates Second Amendment rights. 597 U.S. at 17. We therefore analyze Appellants' Second Amendment challenges under the *Bruen* framework. Doing so does not elevate the Second Amendment above other constitutional rights. Rather, our approach "accords with how we protect other constitutional rights." *Id.* at 24.

## V.

Fencl and Perez-Garcia challenge the Bail Reform Act's firearm condition as applied to them, which means they contend only that the law violates their Second Amendment rights based on the facts of their particular cases. *See In re Nat'l Sec. Letter*, 33 F.4th 1058, 1070 (9th Cir. 2022) (as amended). We therefore assess only whether the Bail Reform Act's firearm condition violates the Second Amendment as applied to Fencl and Perez-Garcia. *See United States v. Chovan*, 735 F.3d 1127, 1141 (9th Cir. 2013), *abrogated on other grounds by Bruen*, 597 U.S. at 17.

The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 561 U.S. 742 (2010), the Supreme Court held that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense. In *Bruen*, the Supreme Court

recognized that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense. 597 U.S. at 9-10.

The Supreme Court has repeatedly emphasized, however, that "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626; *see also Bruen*, 597 U.S. at 21; *McDonald*, 561 U.S. at 786. The Court has recognized, for example, that legislatures may ban "dangerous and unusual weapons" because the Second Amendment does not guarantee an unlimited right to possess every kind of weapon. *Heller*, 554 U.S. at 627. Similarly, legislatures may ban weapons in "sensitive places" because the Amendment does not guarantee an unlimited right to carry weapons in every kind of place. *Id.* at 626; *Bruen*, 597 U.S. at 30.

So too may legislatures regulate who may possess weapons in the first place. In particular, the Court has recognized a historical tradition of disarming individuals who are not "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635. To that end, *Heller* specifically identified "longstanding prohibitions on the possession of firearms by felons and the mentally ill" as non-exhaustive "examples" of "presumptively lawful regulatory measures." *Id.* at 626, 627 n.26. A plurality in *McDonald* similarly observed that the Second Amendment protects "the safety of . . . law-abiding members of the community." 561 U.S. at 790. And it "repeat[ed] [*Heller*'s] assurances" that the Second Amendment presumptively allows Congress to disarm those who are not law-abiding and responsible enough to have weapons, such as felons and individuals with mental illnesses. *Id.* at 786.

In *Bruen*, the Supreme Court again reaffirmed *Heller*'s and *McDonald*'s holding that the Second Amendment protects "the right of an ordinary, law-abiding citizen to possess a handgun in the home." *Bruen*, 597 U.S. at 9-10. The *Bruen* court agreed with the plaintiffs in that case that "ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense." *Id.* At the same time, *Bruen* clarified that text, history, and tradition are the "[o]nly" avenues to justify a firearm regulation. *Id.* at 17. The Supreme Court did so after we and other circuit courts— following *Heller* and *McDonald*—coalesced around a two-step framework for analyzing Second Amendment challenges that combined historical analysis with means-end scrutiny. *See, e.g.*, *Young v. Hawaii*, 992 F.3d 765, 783-84 (9th Cir. 2021) (en banc), *vacated*, 142 S. Ct. 2895 (2022).

*Bruen* rejected this two-step approach and adopted a two-step approach of its own. Rejecting the use of means-end scrutiny, the *Bruen* court instead instructed us to apply the following framework to Second Amendment claims: We first consider whether the Second Amendment's plain text covers an individual's proposed course of conduct. *Bruen*, 597 U.S. at 24. If so, the Second Amendment presumptively protects that conduct. *Id.* The Government then bears the burden of justifying the challenged regulation by showing that it is consistent with our nation's "historical tradition of firearm regulation." *Id.* Only then may we conclude that the regulation is constitutional. With this framework in mind, we turn to Appellants' claims.

A.

The threshold question in a Second Amendment claim is whether the Amendment presumptively protects the individual's conduct. *Id.* In *Bruen*, the Supreme Court

approached this question by asking whether the petitioners were among "the people" within the plain meaning of the Second Amendment and then asking whether the plain text of the Amendment encompasses the individuals' "proposed course of conduct." *Id*. at 31-32.**[8]**

In concluding that Fencl and Perez-Garcia are among the people who have Second Amendment rights, we pause to highlight a lingering ambiguity in the caselaw. The text of the Second Amendment refers to the right of "the people" to keep and bear arms. U.S. Const. amend. II. In *Heller*, the Court interpreted the phrase "the people" to "refer[] to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). In other words, the Court presumed that "the people" refers to "all Americans." *Id.* at 581. But when the Supreme Court specifically analyzed "limitation[s]" on the scope of the Second Amendment's protections, *id.* at 626-27, *Heller* described the Second Amendment right as belonging to "law-abiding, responsible citizens," *id.* at 635. *Bruen*, in turn, used the term "law-abiding, responsible citizens" and its variants more than a

---

[8] The Supreme Court in *Bruen* did not specify which party carries the burden to demonstrate whether the Second Amendment presumptively protects the proposed course of conduct of the party invoking the Second Amendment's protections. We need not decide that issue here because our conclusion that the Second Amendment presumptively protects Fencl and Perez-Garcia's proposed course of conduct would stand regardless of which party in this case carried the burden on this issue.

dozen times when describing the Second Amendment's scope.[9]  The concurrences reiterated the same point.[10]

As then-Judge Barrett explained while dissenting in *Kanter v. Barr*, some courts read the Supreme Court's Second Amendment caselaw to mean that there are certain groups of people—for example, violent felons or the mentally ill—"who fall entirely outside the Second Amendment's scope," meaning that they do not fall within even the plain text of the Amendment.  919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 597 U.S. at 17.[11]  Other courts instead "maintain that all

---

[9] *See Bruen*, 597 U.S. at 15 ("law-abiding, adult citizens"); *id.* at 26 ("law-abiding, responsible citizens") (quotation omitted); *id.* at 29 ("a law-abiding citizen's right to armed self-defense"); *id.* at 30 ("law-abiding citizens"); *id.* at 31 ("ordinary, law-abiding, adult citizens"); *id.* at 33 n.8 ("law-abiding citizens"); *id.* at 38 ("law-abiding citizens"); *id.* at 38 n.9 ("law-abiding, responsible citizens" and "ordinary citizens") (quotations omitted); *id.* at 57 ("the responsible") (quotation omitted); *id.* at 59 ("responsible arms carrying"); *id.* at 60 ("law-abiding citizens"); *id.* at 70 ("law-abiding, responsible citizens"); *id.* at 71 ("law-abiding citizens").

[10] *See Bruen*, 597 U.S. at 72 (Alito, J., concurring) ("law-abiding residents"); *id.* at 74 ("law-abiding citizens" and "[o]rdinary citizens"); *id.* at 75 ("law-abiding person"); *id.* at 76 ("right of law-abiding people," "law-abiding New Yorker," and "ordinary person"); *id.* at 78 ("ordinary law-abiding Americans"); *id.* at 79 (Kavanaugh, J., concurring) ("ordinary, law-abiding citizens") (quotation omitted).

[11] *See, e.g.*, *Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) ("On balance, the historical evidence and the Supreme Court's discussion of felon disarmament laws leads us to reject the argument that non-dangerous felons have a right to bear arms."); *Binderup v. Att'y Gen.*, 836 F.3d 336, 357 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments) ("[T]he Founders understood that not everyone possessed Second Amendment rights. These appeals

people have the right to keep and bear arms but that history
and tradition support Congress's power to strip certain
groups of that right." *Id.*[12]

In Fencl's case, both the magistrate judge and the district
court followed the first approach and held that Fencl is not a
responsible, law-abiding citizen because he was "charged
with unlawful possession of firearms based on a finding of
probable cause." Under this view, Fencl "falls outside the
scope" of the Second Amendment. Similarly, the magistrate
judge in Perez-Garcia's case denied his request, in part, on
the ground that he is not a law-abiding citizen because there
is probable cause to believe that he committed a crime.

Although Appellants are pretrial releasees, they remain
members of the national community—that is, they fall
within the plain meaning of "the people"—and they are
therefore not without the ability to invoke their constitutional
right. *See Heller*, 554 U.S. at 580. The Bail Reform Act's
firearm prohibition is a condition of pretrial release, so it
only applies to those who have been charged but not yet
convicted. While we recognize that well-founded criminal
accusations can, pursuant to adequate procedural
protections, result in *limitations* on individual rights, *see*
*Salerno*, 481 U.S. at 747, 750-52, it is quite another matter
to say that a criminal defendant loses his or her ability to
even challenge the condition itself under the Second

---

require us to decide who count among 'the people' entitled to keep and
bear arms."), *abrogated on other grounds by Bruen*, 597 U.S. at 17.

[12] *See, e.g.*, *United States v. Rahimi*, 61 F.4th 443, 451-53 (5th Cir.), *cert.*
*granted*, 143 S. Ct. 2688 (2023); *Range v. Att'y Gen.*, 69 F.4th 96, 103
(3d Cir. 2023) (en banc) ("[W]e reject the Government's contention that
only 'law-abiding, responsible citizens' are counted among 'the people'
protected by the Second Amendment.").

Amendment. After all, even convicted persons serving their sentences enjoy freedoms of speech and religion under the First and Fourteenth Amendments, as well as equal protection and due process protection. *See Bell*, 441 U.S. at 545. In our view, to allow the government to exclude an entire group of individuals from "the people" through mere accusation would be, at minimum, inconsistent with the presumption of innocence. *See Scott*, 450 F.3d at 874 ("Defendant is, after all, constitutionally presumed to be innocent pending trial, and innocence can only raise an inference of innocence, not of guilt.").

As to Fencl, specifically, we cannot conclude that his prior misdemeanor conviction or arrests should operate to categorically exclude him from the national community. While the Supreme Court has identified a longstanding tradition of prohibiting convicted *felons* from possessing guns, it has never suggested that felons are not among "the people" within the plain meaning of the Second Amendment, nor has it said anything at all about the rights of misdemeanants or arrestees. *See McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by *felons*.'" (emphasis added) (quoting *Heller*, 554 U.S. at 626-27)). We have already held that at least one group of misdemeanants—specifically, domestic violence misdemeanants—is "entitled to some measure of Second Amendment protection." *Chovan*, 735 F.3d at 1137 (citation omitted), *abrogated on other grounds by Bruen*, 597 U.S. at 17; *see also United States v. Chester*, 628 F.3d 673, 681 (4th Cir. 2010) (assuming that a domestic violence misdemeanant's "Second Amendment rights are intact"), *abrogated on other grounds by Bruen*, 597 U.S. at 17. We

therefore conclude that Fencl and Perez-Garcia are among "the people" within the meaning of the Second Amendment's "bare text." *Bruen*, 597 U.S. at 44 n.11.

We next ask whether the Second Amendment presumptively protects Appellants' proposed course of conduct. It does. Fencl wanted to carry guns to protect his home and for self-defense when he traveled out of state for work. Perez-Garcia wanted to carry guns so that he could pursue employment as an armed security officer and protect his family. Their requests track the core constitutional right to possess a handgun for self-defense inside and outside the home, as defined by *Heller* and *Bruen*, respectively. *See Bruen*, 597 U.S. at 9-10.

The Second Amendment may not protect Fencl's right to bear or keep "dangerous and unusual weapons," which might include ghost guns or silencers or armor-piercing ammunition. *Heller*, 554 U.S. at 627 (citation omitted). *Heller* made clear—and *Bruen* affirmed—that the presumptive protections of the Second Amendment may be rebutted as to arms not "'in common use' today for self-defense." *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627). But we need not decide this issue because the challenged condition restricts Fencl's ability to bear or keep *any* firearm—even those he would lawfully store at home for self-defense—and therefore unquestionably implicates his Second Amendment rights. Accordingly, we conclude that the Second Amendment presumptively protects Appellants' proposed course of conduct.

B.

Because we conclude that the Second Amendment presumptively protects Appellants' proposed course of conduct while awaiting trial for their criminal charges, the

Government bears the burden of proving that application of the Bail Reform Act's firearm condition to them is consistent with our nation's "historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

At the second prong of the *Bruen* framework, the central question is whether the modern regulation is "relevantly similar" to historical laws and traditions, *id.* at 29 (citation omitted), so as to "evince[] a comparable tradition of regulation," *id.* at 27. *Bruen* emphasized that we must uphold a modern regulation if the government identifies a "well-established and representative historical analogue." *Id.* at 30 (emphasis omitted). The government does not have to identify "a historical twin." *Id*. (emphasis omitted). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

The "central" consideration in this analysis is whether, when compared to a modern regulation, the historical precedent imposed a "comparable burden" on the right of armed self-defense and was "comparably justified." *Id.* at 29 (emphasis omitted and citation omitted). In other words, both the modern regulation and the historical precedent must align as to "how and why [they] burden a law-abiding citizen's right to armed self-defense." *Id.*

Here, the Government contends that the Bail Reform Act's firearm condition, as applied to Fencl and Perez-Garcia, is consistent with how and why our nation has historically disarmed criminal defendants facing serious charges while awaiting trial and, more generally, those who are not law-abiding, responsible citizens. We agree for the reasons provided below.

1.

We begin with how and why the Bail Reform Act's firearm condition burdens Appellants' Second Amendment rights. The firearm condition imposes a heavy burden on Appellants' rights to bear arms because it prohibits them from possessing or attempting to possess *any* firearm. On the other hand, the firearm condition is a temporary one, lasting only through the pendency of trial, s*ee* 18 U.S.C. § 3142(a), and the condition is imposed only upon individualized consideration by a judicial officer. *Id.*[13] So in *Bruen*'s terms, "how" the regulation burdens Appellants' Second Amendment rights is through a complete, albeit temporary and individually tailored, prohibition on the right to bear arms.

As to the "why," we can readily discern the purpose behind the firearm condition based on the plain text of the Bail Reform Act. The Act authorizes imposition of a firearm condition only if it is among the least restrictive ways to "reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id.* § 3142(c)(1)(B). Public safety is the foremost consideration

---

[13] Appellants dispute that the Bail Reform Act's firearm condition is narrowly applied in the Southern District of California at large. They claim that judges in the district "virtually never strike the condition" and say their "review of over 150 release orders identified just one, a Social Security fraud misdemeanor, without the condition." But Appellants contend only that the firearm condition is unconstitutional as applied to *them* and therefore seek only a modification of *their* pretrial release conditions. We do not take up the question whether the firearm condition may theoretically be applied to others because "[a]n as-applied challenge does not implicate the enforcement of the law against third parties." *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998). And Appellants do not dispute that their firearm conditions were imposed only after individualized review.

behind such a condition, but it is not difficult to imagine that risk of flight could also play a role in its imposition. *See Salerno*, 481 U.S. at 753. Having understood how and why the Bail Reform Act's firearm condition burdens Fencl's and Perez-Garcia's Second Amendment rights, we next move to the Government's proffered historical precedent.

2.

The Government first contends that application of the Bail Reform Act's firearm condition on Appellants is justified by our nation's history of disarming criminal defendants facing serious charges pending trial. Based on our historical review, we agree that our society has traditionally subjected criminal defendants to temporary restrictions on their liberty—including restrictions that affect their ability to keep and bear arms—to protect public safety and to ensure defendants' attendance at trial. As we explain below, the combination of separate but related founding era practices supports this conclusion: (1) most serious crimes were eligible for capital charges; (2) the government had the power to detain, and usually did detain, defendants indicted on capital charges; and (3) once detained, criminal defendants were completely disarmed. The Bail Reform Act's firearm condition as applied to Fencl and Perez-Garcia fits within this historical tradition of firearm regulation.

The goal of *Bruen*'s analogical exercise is to use history to "delimit[] the outer bounds of the right to keep and bear arms." 597 U.S. at 19. For that purpose, *Bruen* explained, "not all history is created equal." *Id.* at 34. Emphasizing that the right codified in the Second Amendment was a "pre-existing right," the Court saw particular relevance in "English history dating from the late 1600s, along with

American colonial views leading up to the founding." *Id.* at 20 (emphasis omitted) (quoting *Heller*, 554 U.S. at 592). The *Bruen* court also found post-ratification practices from the late 18th and early 19th centuries as bearing on this question. *See id.* at 35-36. We focus on sources from those same historical time periods.

Since the Founding, the government has been empowered to detain criminal defendants while they await trial. *See* U.S. Const. amend. V (providing that a person may be "held to answer for a capital, or otherwise infamous crime . . . on a presentment or indictment of a Grand Jury"); Act of Sep. 24, 1789, ch. XX § 33, 1 Stat. 73, 91 ("[F]or any crime or offence against the United States, the offender may . . . be arrested, and imprisoned.").[14] Pretrial detention in the founding era involved total disarmament. As one 19th century state Supreme Court justice observed, "[p]ersons accused of a crime, upon their arrest, have constantly been divested of their arms, without the legality of the act having ever been questioned." *State v. Buzzard*, 4 Ark. 18, 21 (1842) (opinion of Ringo, C.J.); *see also United States v. Rahimi*, 61 F.4th 443, 464 (5th Cir.) (Ho, J., concurring) ("Arrest and incarceration naturally entail the loss of a wide range of liberties—including the loss of access to weapons."), *cert. granted*, 143 S. Ct. 2688 (2023); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983) ("We may presume that persons confined in gaols awaiting

---

[14] Indeed, detention pending trial, in the basic form it exists today, dates to the Assize of Clarendon issued by King Henry II in 1166. *See generally* William F. Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb. L. Rev. 33, 44-45 (1977).

trial on criminal charges were . . . debarred from the possession of arms.").

Not everyone facing criminal charges was subject to pretrial detention, to be sure. Bail, or pretrial release, also has deep historical roots. But pretrial release was far rarer in the founding era than it is today because the founding generation generally did not allow defendants facing capital charges to be released pending trial, and most serious criminal acts and felonies constituted capital offenses. The first Congress, for example, made bail available in all criminal cases "except where the punishment may be death." *See* Act of Sep. 24, 1789, ch. XX, § 33, 1 Stat. 73, 91. Many early state constitutions similarly provided an affirmative right to pretrial release except for those accused of "capital" crimes. *See, e.g.*, Pa. Const. ch. ii, § 28 (1776) ("All prisoners shall be bailable by sufficient sureties, unless for capital offences, when proof is evident, or presumption great."); N.C. Const. Art. XXXIX (1776); Vt. Const. ch. II, § 25 (1777); An Ordinance for the Government of the Territory of the United States Northwest of the River Ohio (1787) § 14, art. 2, 2 *Laws of the United States of America* 559, 564 (1797); *cf.* 4 William Blackstone, *Commentaries* \*294 ("[I]n felonies, and other offences of a capital nature, no bail can be a security equivalent to the actual custody of the person.").

As early state court decisions show, this practice continued after the Second Amendment was ratified. *See State v. Hill*, 1 Tread. 242, 246 (S.C. Const. App. 1812) (opinion of Smith, J.) ("The general rule is, not to admit to bail after bill found, in capital cases."); *People v. Tinder*, 19 Cal. 539, 539 (1862) ("An indictment for a capital offense furnishes of itself a presumption of the guilt of the defendant too great to entitle him to bail as matter of right under the

Constitution, or as matter of discretion under the legislation of the State.").

Importantly, "capital crimes" in the founding era encompassed a broad set of offenses. Most serious crimes and felonies were eligible for capital charges because "death was the standard penalty for all serious crimes at the time of the founding." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) (internal quotation marks omitted). In the pre-Revolutionary era, Blackstone explained the English practice this way: "[t]he idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them." 4 William Blackstone, *Commentaries* \*98.

The Founders shared a similar understanding. At the time of the Second Amendment's ratification, for example, nonviolent crimes such as forgery and horse theft were capital offenses. *See Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (citing Stuart Banner, *The Death Penalty: An American History* 23 (2002) (describing the escape attempts of men condemned to die for forgery and horse theft in Georgia between 1790 and 1805)). The First Congress imposed capital punishment for crimes such as "forgery of United States securities" and "running away with a ship or vessel, or any goods or merchandise to the value of fifty dollars." *Harmelin v. Michigan*, 501 U.S. 957, 980-81 (1991) (opinion of Scalia, J.) (quoting An Act for the Punishment of Certain Crimes Against the United States, Chap. IX, § 8, 1 Stat. 112, 114 (1790)) (cleaned up). In sum, the historical record evinces a historical tradition of complete disarmament of criminal defendants facing serious or felony charges pending trial.

*Bruen* next requires us to consider whether our nation's history and tradition of disarming criminal defendants facing serious charges pending trial is "relevantly similar" to the Bail Reform Act's pretrial release firearm condition as applied to Appellants. *Bruen*, 597 U.S. at 29 (citation omitted). Again, both regulations must align as to "how and why [they] burden a law-abiding citizen's right to armed self-defense." *Id.*

We conclude that the Bail Reform Act's pretrial release firearm condition as applied to Appellants is "relevantly similar" to the founding era tradition of disarming criminal defendants facing serious crimes so as to "evince[] a comparable tradition of regulation." *Id.* at 27, 29 (citation omitted). First, the historical tradition of pretrial disarmament imposed "a comparable burden" on defendants' Second Amendment rights as the Bail Reform Act's firearm condition imposes on Appellants today. *Id.* at 29. Both the modern restriction and its historical precursor allow for complete but temporary disarmament on a narrow subset of the population: criminal defendants awaiting trial for their alleged, serious crimes. Second, both the modern and historical regulations are "comparably justified." *Id.* Like the Bail Reform Act's firearm condition, the historical justifications for pretrial detention and disarmament have long included protecting the public from future criminal acts of the accused defendant. *Compare* A. Highmore, *A Digest of the Doctrine of Bail: In Civil and Criminal Cases*, vii (1783) (explaining that pretrial detention in the late 18th century ensured that "the safety of the people should be preserved against the lawless depredations of atrocious offenders"), *with Salerno*, 481 U.S. at 750 (noting that the purpose of the Bail Reform Act was to respond to "the alarming problem of crimes committed by persons on

release," and holding that the Government has a "compelling" and "heightened" interest in preventing crime and arrestees from presenting a "demonstrable danger to the community" (citation omitted)). Both the "how" and the "why" match.

Appellants disagree. They do not dispute the well-established historical tradition of pretrial detention, nor that detained individuals accused of serious crimes were completely disarmed in the founding era. They argue instead that the "institution of pretrial detention" fails to provide the appropriate analogy here because they were granted pretrial release. In their view, the Government must provide examples of pre-20th century "courts or legislatures restricting *pretrial releasees*' arms rights" and has failed to do so.

Appellants' arguments fail to persuade for two reasons. First, they assume that because they were granted pretrial release today, they would have been released pending their trials in the founding era. The historical evidence before us does not support that assumption. As we have explained, defendants in the founding era who faced serious charges were not released because those indicted on capital charges were not offered bail, and most felonies were capital offenses. *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring) (highlighting the "ubiquity of the death penalty in the founding era" and noting that it was "the standard penalty for all serious crimes" in the late 18th century (quoting Banner, *supra*, at 23)). Appellants have not pointed to any evidence in the historical record to rebut the Government's showing that criminal defendants facing capital or otherwise serious crimes were not eligible for pretrial release and were therefore detained and disarmed. *See Territory v. Benoit*, 1 Mart. (o.s.) 142, 142-43 (Orleans

1810) ("Bail is never allowed in offences punishable by death, when the proof is evident or the presumption great. . . . We recollect no case in which it was done.").

Appellants undoubtedly were charged with serious crimes. Fencl was charged with seven felony counts, each punishable by up to ten years' imprisonment. *See* 26 U.S.C. § 5871. Perez-Garcia was charged with two felony counts of importing approximately eleven kilograms of methamphetamine and half a kilogram of fentanyl in violation of 21 U.S.C. §§ 952, 960. Each of those counts is punishable by up to ten years' imprisonment. *See* 21 U.S.C. § 960(b)(1). Felonies in the founding era "were—and remain—the most serious category of crime deemed by the legislature." *Medina*, 913 F.3d at 158. Because Appellants faced serious felony charges, the premise that they would have been released in the founding era is belied by the historical record. *See Tennessee v. Garner*, 471 U.S. 1, 13 (1985) (explaining that in the founding era "virtually all felonies were punishable by death").

Today, of course, pretrial release is far more common. That is mainly because of successful reforms beginning in the 1960s that resulted in a dramatic decrease in the percentage of defendants detained before trial. *See* Timothy R. Schnacke et al., *The History of Bail and Pretrial Release*, Pretrial J. Inst. 11-16 (2010).[15] And we no longer subject people to capital punishment for, say, horse theft. *See Medina*, 913 F.3d at 158 (describing how penalties for many

---

[15] *See also* John S. Goldkamp, *Danger and Detention: A Second Generation of Bail Reform*, 76 J. Crim. L. & Criminology 1, 12 (1985). In 1962, for example, only about half of felony defendants across 20 cities secured pretrial release; by 1971, the percentage had risen to two-thirds. *See* Wayne H. Thomas, *Bail Reform in America* 32, 37-38 (1976).

felony offenses became less severe in the decades following American independence). That Appellants are eligible for pretrial release today, however, does not undermine the historical evidence that similarly situated criminal defendants in the founding era would not have been released and would have instead been disarmed. As an initial matter, then, Appellants' reasoning fails on its own terms.

Second, and more fundamentally, Appellants' mode of historical analysis rests on a flawed premise. They presume that if the Government cannot identify a historical regulation under which Perez-Garcia and Fencl, specifically, would have been disarmed pending pretrial release in the 18th century, then the Second Amendment forbids such regulation today. They are mistaken. The Second Amendment does not require the Government to identify an 18th century law that is a "dead ringer" for the modern pretrial release regime that materialized in the 1960s. *Bruen*, 597 U.S. at 30. Rather, analogical reasoning under *Bruen* "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin.*" *Id.* (emphasis in original)*.* Having established that the firearm condition as applied to Appellants is consistent with our nation's tradition of disarming criminal defendants charged with serious crimes pending trial, the Government need not go further and dig up an 18th century law under which Fencl and Perez-Garcia, specifically, would have been disarmed while awaiting trial for crimes like unlawful possession of unlicensed silencers or importing methamphetamine and fentanyl.

*Bruen* repeatedly made this point. For example, the Court surveyed the historical record and found "relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited," like legislative

assemblies, polling places, and courthouses. *Id.* But modern legislatures are not limited to regulating guns in *only* those sensitive places. Instead, the Second Amendment allows "modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places." *Id.* (emphasis in original). Similarly, the Supreme Court has maintained that the Second Amendment "presumptively" allows Congress to disarm persons convicted of felony offenses, *see Heller*, 554 U.S. at 626 & n.26; *McDonald*, 561 U.S. at 786, even though the first federal law disarming felons dates to 1938, *see* Federal Firearms Act, Pub. L. 75-785, ch. 850, § 2(d)-(f ), 52 Stat. 1250, 1251 (1938). And while legislatures may prohibit "dangerous and unusual weapons," in applying that principle courts must analyze whether particular weapons are dangerous and unusual *today*, not whether they were widespread in the founding era. *See Bruen*, 597 U.S. at 47 ("Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today.").

The common-sense principle underscored by the Supreme Court is that the Constitution does not impose a "regulatory straightjacket" on our modern society. *Id.* at 30. In this case, history shows that we have a tradition of disarming criminal defendants facing serious charges pending trial. The historical tradition of pretrial disarmament allows legislatures to disarm people who are facing serious charges *today*, regardless of whether laws disarming those same exact persons happened to exist in the founding era. The Government has proven that Fencl's and Perez-Garcia's temporary disarmament is justified by that historical tradition. That is all that the Second Amendment requires.

3.

The Government also contends that the Bail Reform Act's firearm condition is further justified by our nation's history of barring people or groups deemed dangerous or unlikely to respect the sovereign's authority from possessing firearms. Our review of the historical record similarly reveals a lengthy and extensive Anglo-American tradition of disarming individuals who are not law-abiding, responsible citizens. In particular, the historical record reflects that legislatures have long disarmed groups or individuals whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others. This historical tradition provides a separate ground in support of the Government's position.

As *Bruen* requires, we begin by analyzing the Government's proffered historical tradition. And because the Second Amendment "codified a right 'inherited from our English ancestors,'" we start in 17th century England. *Heller*, 554 U.S. at 599 (citation omitted). Parliament first recognized a legal right to possess arms in the 1688-89 English Bill of Rights, which guaranteed rights to keep and bear arms "*as allowed by Law*." An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crowne ("1688-89 English Bill of Rights"), 1 W. & M., Sess. 2, ch. 2, § 7, in 6 Statutes of the Realm 142-45 (Eng. 1688) (emphasis added). The Bill recited that King James II, who had been deposed in the Glorious Revolution, had disarmed "severall good subjects being Protestants." *Id.* While the Bill of Rights condemned the disarming of "good subjects," it allowed the disarming of irresponsible ones. It did not displace the Militia Act of 1662, which authorized local officials to disarm individuals they judged "dangerous to the Peace of the Kingdom."

Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13. Use of the Militia Act provisions allowing search and seizure of weapons from disaffected persons "continued unabated" after the adoption of the 1688-89 English Bill of Rights. *See* Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 405 (2019).

Importantly, this English tradition of lawful disarmament coexisted with the fundamental right to keep and bear arms. Although the English Bill of Rights secured a right to possess arms, the government could—and did—disarm those who could not be trusted to use arms lawfully and responsibly. Because the English right "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, this background supports the view that the Second Amendment also empowers Congress to authorize the disarming of individuals who are not law-abiding, responsible citizens.

Similar laws and restrictions appeared in the American colonies, adapted to our own contemporary fears and perceived threats. For example, Catholics in the Maryland, Virginia, and Pennsylvania colonies were disarmed because of perceived disloyalty to the government and disrespect for the sovereign's laws. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020).[16] As the Revolutionary War approached, Connecticut, Massachusetts, Pennsylvania, New Jersey, Virginia, and

---

[16] "Virginia exempted from disarmament anyone willing to take an oath of allegiance to King George III," and its disarmament excepted "necessary weapons . . . for the defence of . . . house or person." Greenlee, *supra*, at 263 (citation omitted).

North Carolina all enacted disarmament laws targeting the
disloyal and those that could not be trusted to respect the
sovereign's authority. *Id.* at 263-65. "The justification was
always that those being disarmed were dangerous." *Id.* at
265; *see also NRA v. Bureau of Alcohol, Tobacco, Firearms,
& Explosives*, 700 F.3d 185, 200 (5th Cir. 2012) ("American
legislators had determined that permitting [those who
refused to swear an oath of allegiance] to keep and bear arms
posed a potential danger."), *abrogated by Bruen*, 597 U.S. at
17.

Other early American laws, meanwhile, called for case-
by-case judgments and disarmed individuals for particular
types of conduct. Inspired by England's 1328 Statute of
Northampton, Massachusetts Bay in 1692, New Hampshire
in 1759, and Massachusetts in 1795 forbade carrying arms
in an aggressive and terrifying manner. Greenlee, *supra*, at
262. For example, "[c]olonial Massachusetts and New
Hampshire both authorized justices of the peace to arrest all
Affrayers, Rioters, Disturbers, or Breakers of the Peace, and
such as shall ride or go armed Offensively . . . by Night or
by Day, in Fear or Affray of Their Majesties Liege People."
*See Bruen*, 597 U.S. at 47 (quoting 1692 Mass. Acts and
Laws no. 6, pp. 11-12 and 1699 N.H. Acts and Laws ch. 1).
Similarly, "[a] 1736 Virginia legal manual allowed for
confiscation of arms, providing that a constable 'may take
away Arms from such who ride, or go, offensively armed, in
Terror of the People' and may bring the person and their
arms before a Justice of the Peace." Greenlee, *supra*, at 262
(quoting George Webb, *The Office of Authority of a Justice
of Peace* 92-93 (1736)). A New Jersey law empowered
officials to "take from such Persons as they shall judge
disaffected and dangerous to the present Government, all the
Arms, Accoutrements and Ammunition which they own or

possess." Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 90.

Precursors to the Second Amendment proposed in state ratifying conventions also suggest that the founding generation believed legislatures could disarm individuals deemed dangerous or unlikely to follow the sovereign's laws. At the Massachusetts ratifying convention, Samuel Adams, who opposed ratifying the Constitution without a declaration of rights, proposed providing that Congress may not "prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 675, 681 (1971) (emphasis added). "Adams's proposal was celebrated by his supporters as ultimately becoming the Second Amendment." Greenlee, *supra*, at 266. "For example, an editorial in the *Boston Independent Chronicle* called for the paper to republish Adams's proposed amendments alongside Madison's proposed Bill of Rights, 'in order that they may be compared together,' to show that every one of Adams's intended alterations but one . . . was adopted." *Id.* (alterations adopted) (quoting Editorial, *Boston Independent Chronicle*, Aug. 20, 1789, at 2, col. 2)).

In Pennsylvania, Anti-Federalist delegates—who were adamant supporters of a declaration of fundamental rights—proposed that the people should have a right to bear arms "*unless for crimes committed, or real danger of public injury from individuals*." Schwartz, *supra*, at 665 (emphasis added). As Justice Scalia noted in *Heller*, this was a "highly influential" proposal. 554 U.S. at 604. While neither proposal was adopted exactly as written, they reflect an expansive understanding in the founding era of the scope of legislatures' power to disarm, particularly among those who

most strongly favored enshrining the right to armed self-defense in the Constitution.

Post-ratification practice points in the same direction. Antebellum commentators shared the founding generation's understanding of the Second Amendment's scope. John Holmes, a legal scholar from Maine, interpreted the Second Amendment and its state counterpart to mean that a "free citizen, *if he demeans himself peaceably*, is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840) (emphasis added). "Thus are the rights of self defence guarded and secured," he added, "to every one *who entitles himself by his demeanor* to the protection of his country." *Id.* (emphasis added). And a state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms." *State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1.

As the Supreme Court explained in *Bruen*, many states also enacted surety statutes in the mid-19th century requiring "those threatening to do harm" to "post bond before carrying weapons in public." *Bruen*, 597 U.S. at 55; *see, e.g.*, Mass. Rev. Stat. ch. 134, § 16, 750 (1836); Me. Rev. Stat. ch. 169, § 16, 709 (1840); Mich. Rev. Stat. ch. 162, § 16, 692 (1846). These statutes demonstrate that individuals who were "reasonably accused of intending to injure another or breach the peace" could properly be subject to moderate firearm restrictions that did not apply to others. *Bruen*, 597 U.S. at 57.

In sum, the Anglo-American right to keep and bear arms for self-defense has always coexisted with legislative authority to disarm groups or individuals whose possession of firearms would pose an unusual danger, beyond the

ordinary citizen, to themselves or others. Or, as now-Justice Barrett put it, "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting).[17]

We conclude that the Bail Reform Act's firearm condition as applied to Fencl and Perez-Garcia fits within the Government's proffered historical tradition of disarming people whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others. *See Bruen*, 597 U.S. at 29.

First, the Bail Reform Act's firearm condition is a clear exercise of Congress' historical legislative power to disarm those who are "judged to be a threat to the public safety." *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). As discussed, Congress passed the Bail Reform Act to respond to "the alarming problem of crimes committed by persons on release." *Salerno*, 481 U.S. at 742 (citation omitted). The purpose of the statute was to give courts authority to make release decisions that recognize "the danger a person may pose to others if released." *Id.* (citation omitted). And the

---

[17] To the extent that "courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868," we note that post-Civil War practice reinforced this historical understanding. *Bruen*, 597 U.S. at 37. In 1866, for example, a federal Reconstruction order applicable to South Carolina provided that "[t]he constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," but that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866). The Freedman's Bureau issued a circular around the same time that explained that a person "may be disarmed if convicted of making an improper or dangerous use of weapons." *Bruen*, 597 U.S. at 63 (quotation omitted).

Act authorizes federal courts to release defendants awaiting trial subject to specific conditions that "protect the community from the risk of crimes [they] might commit while on bail." *Scott*, 450 F.3d at 874. Moreover, the plain text of the Bail Reform Act provides that the firearm condition may be imposed only if it is among the least restrictive ways to "reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). The Bail Reform Act's firearm condition is thus specifically designed to disarm those whose possession of firearms would pose an unusual danger to the community.

Second, the Bail Reform Act's firearm condition does not broadly prevent law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms. *Cf. Bruen*, 597 U.S. at 71. It instead concerns only the rights of a narrow segment of the population arrested and charged with federal crimes. 18 U.S.C. § 3141(a)-(b). Congress today, like the founding era legislatures described above, retains the power to disarm narrow segments of the population whom it deems a threat to public safety. *See Kanter*, 919 F.3d at 458 (Barrett, J., dissenting).

Relatedly and importantly, the firearm condition at issue here is individually tailored and applied only after consideration by a judicial officer. 18 U.S.C. § 3142(a). Local officials have long disarmed those whose conduct revealed their unfitness to access firearms. For example, many 18th century justice-of-the-peace manuals recognized that the Militia Act authorized local officials to disarm those they "judge[d] dangerous." *See, e.g.*, Robert Gardiner, *The*

*Compleat Constable* 68 (3d ed. 1708).**[18]**    Similarly, American justices of the peace have long been empowered to confiscate the arms of persons who carried them in a manner that spread fear or terror in the community. *See* Greenlee, *supra*, at 262 (collecting colonial era sources authorizing the confiscation of arms by local officials for reasons of public safety). Surety statutes also empowered local officials to temporarily disarm specific individuals who "threaten[ed] to do harm" or were "reasonably accused of intending to injure another or breach the peace." *Bruen*, 597 U.S. at 55, 57. In short, regulations that authorize disarmament only after individualized findings of dangerousness by public officials are within the heartland of legislative power to disarm those who are not law-abiding, responsible citizens.

The Government in this case acted in accordance with this historical tradition. The Government established an individualized need for applying the firearm condition against each Appellant in adversarial proceedings before two sets of neutral judicial officers. Those neutral judicial officers determined based on the evidence presented that Appellants posed a risk while on bail and that the firearm condition was the least restrictive way to assure the safety of the community as well as their appearances in court.

The record amply supports the judicial officers' decisions to temporarily disarm Appellants. As to Fencl, officers found more than 100 firearms in his house, including

---

[18] *See also* Giles Jacob, *The Modern Justice* 338 (2d ed. 1717); W. Nelson, *The Office and Authority of a Justice of Peace* 9-10 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (1719); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward Officer* 231 (6th ed. 1756).

"ghost guns," thousands of rounds of ammunition, armor-piercing bullets, incendiary rounds, and even a tear-gas grenade. Fencl had previously been convicted for unlawful possession of a concealed gun without a license and arrested for possession of a privately made ghost gun. The district court appropriately reviewed Fencl's stockpile and his propensity to violate gun laws and deemed him dangerous enough to temporarily bar him from possessing firearms pending his trial. As for Perez-Garcia, the district court found that the "nature of the charges and weight of the evidence supports a conclusion that Defendant is a danger to others" because he was apprehended in a vehicle containing approximately eleven kilograms of methamphetamine and half a kilogram of fentanyl when it arrived at the port of entry. The district court's "equation of [wide-scale] drug trafficking with dangerousness to the community" in this particular case has "a reasonable basis in common experience." *See United States v. Strong*, 775 F.2d 504, 508 (3d Cir. 1985) (as amended). By disarming both Fencl and Perez-Garcia after individualized findings of dangerousness, the Government acted consistent with its traditional regulatory authority.

Finally, we note that the firearm condition only temporarily infringed on Fencl's and Perez-Garcia's right to keep and bear arms. Temporary disarmaments are well-precedented. Parliament, for example, allowed Catholics who "repeated and subscribed" to the necessary oath to rearm. 1 W. & M., Sess. 1, ch. 15, § 3, in 6 Statutes of the Realm 71-73 (Eng. 1688). Virginia gave Catholics the same choice. *See* Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 174 (3d ed. 2022). Nineteenth century surety statutes also show that individuals who were "reasonably accused of intending

to injure another or breach the peace" could properly be subject to temporary firearm restrictions that did not apply to others. *Bruen*, 597 U.S. at 57. Similarly here, both Fencl and Perez-Garcia were temporarily disarmed pending trial for their serious charges.

Appellants reject the Government's proffered historical tradition. They note that the "loyalty oath" statutes were primarily adopted at the height of the American Revolution and argue that "[r]egulations limited to times of 'turmoil' and 'rebellion' shed little light on the Second Amendment." They find the affray statutes prohibiting bearing arms in a way that spreads fear or terror in the community inapt because those statutes did not encroach on the right to keep arms at home. And they claim the surety statutes "were too few and too late to constitute a founding-era 'tradition.'"

Appellants' divide-and-conquer approach to the historical evidence misses the forest for the trees. In applying the Second Amendment, we do not isolate each historical precursor and ask if it differs from the challenged regulation in some way. We emphasize again: *Bruen* does not require the Government to identify a "historical twin" or an 18th century "dead ringer" for the Bail Reform Act's firearm condition. 597 U.S. at 30 (emphasis omitted). We instead examine the historical evidence as a whole, determining whether it establishes a tradition of permissible regulation (such as "dangerous and unusual weapons" or "sensitive places"), and whether the historical precedent and the modern regulation are "relevantly similar," *Bruen*, 597 U.S. at 27 (citation omitted), so as to "evince[] a comparable tradition of regulation," *id.* at 29.

Moreover, although traditional firearm regulations are an important form of historical evidence, they are not the only

one. In assessing the Second Amendment's original meaning, we must consult "a variety of legal and other sources," *Heller*, 554 U.S. at 605, including English history, *id.* at 598-600; analogous provisions in state constitutions, *id.* at 600-03; Second Amendment precursors, *id.* at 604-05; commentary, *id.* at 605-10, 616-19; case law, *id.* at 610-14; and legislative debates, *id.* at 614-16.

Here, the historical evidence, when considered as a whole, shows a long and broad history of legislatures exercising authority to disarm people whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others. *See Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). The temporary disarmament of Fencl and Perez-Garcia as a means reasonably necessary to protect public safety falls within that historical tradition.

\* \* \*

We therefore hold that the Bail Reform Act's firearm condition on pretrial release is constitutional as applied to Fencl and Perez-Garcia. Our holding is consistent with how we have long balanced the constitutional rights of pretrial detainees and releasees with legitimate public safety and logistical considerations. *See, e.g.*, *Bell*, 551 U.S. at 546-48 (upholding restrictions on the First, Fifth, and Fourteenth Amendment rights of a class of pretrial detainees); *Albright v. Oliver*, 510 U.S. 266, 278 (1994) (Ginsburg, J., concurring) (noting that a pretrial releasee must "seek formal permission from the court . . . before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction"). And our holding is consistent with our nation's long history of temporarily disarming criminal defendants facing serious charges and those deemed dangerous or unwilling to follow the law.

As held in our order dated January 26, 2023, we **AFFIRM.** Appellants' motion to dismiss these appeals is **DENIED.**